# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-4075

_____

| | |
|---|---|
| Marcia A. Hocevar, | * |
| | * |
| Plaintiff - Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota. |
| Purdue Frederick Company; Timothy | * |
| Amundsen, | * |
| | * |
| Defendants - Appellees. | * |

_____

Submitted:  October 21, 1999

Filed:  August 9, 2000

_____

Before BEAM, LAY and JOHN R. GIBSON, Circuit Judges.

_____

LAY, Circuit Judge, with whom Judge John R. Gibson joins in Part IIA.


This is an appeal brought by Marcia Hocevar (Hocevar) from the district court's grant of summary judgment in favor of Purdue Frederick Company (Purdue), her former employer, in a sexual harassment and retaliation claim brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.  The district court found that the plaintiff was a member of a protected class (a female) but that she failed as a matter of law to demonstrate a genuine dispute of material fact on both of her claims.  In addition to denying her claim of retaliation, the court found that Hocevar had not shown a

hostile work environment because it concluded that the alleged harassment was neither pervasive nor severe. For the reasons stated below, the majority of the court (Judges Beam and Gibson) affirm the grant of summary judgment on the hostile work environment claim; a different majority of the court (Judges Lay and Gibson) reverse and remand for trial on Hocevar's retaliation claim.

## I. BACKGROUND

The record shows that Marcia Hocevar began working at Purdue in August 1988 as a pharmaceutical sales representative. While working for Purdue in Minnesota between 1988 and 1992, Hocevar consistently out performed her then co-worker Timothy Amundsen (Amundsen) and was often ranked in the top sales percentile nationally. Hocevar was promoted three times in five years, the final promotion being to the position of sales training manager at corporate headquarters in Norwich, Connecticut. Hocevar's bonuses reflect her good sales record, and her performance was rated at the highest possible level.

In June 1994, Hocevar transferred to Minnesota due to her impending marriage where she was placed under the supervision of Amundsen, the new district manager, and took over the sales territory previously assigned to him.[1] Despite Hocevar's history of top-notch performance evaluations, Amundsen rated Hocevar at the lowest possible level in October and November 1994. Amundsen gave Hocevar an additional adverse rating in February 1995.

In March 1995, Amundsen accused Hocevar of lying and making false sales reports. A company investigation concluded no wrongdoing on Hocevar's part. Shortly thereafter, in July 1995, Amundsen again gave Hocevar the lowest possible

___

[1]The district court dismissed the action against Amundsen. There is no appeal from that order of dismissal.

performance rating despite the fact that she demonstrated a sales growth of seven percent. At some point, Purdue took away a portion of Hocevar's sales territory – an area including the world renown Mayo Clinic and LaCrosse, Wisconsin.[2] This action was taken by Amundsen despite the fact that Hocevar exceeded Amundsen's <u>own prior sales record</u> in the same territory and received bonuses for exceeding sales quota. These areas remained unstaffed for three months following removal from Hocevar's territory.

On August 11, 1995, Amundsen recommended Hocevar for probation based on her past year's performance. Following an automobile accident, Hocevar took disability leave from August 16, 1995, until September 15, 1995. Despite her absence, Hocevar again met her sales quota and earned a bonus. Hocevar took additional disability leave on October 21, 1995, and requested a part-time work schedule accommodation. Amundsen denied her request. As a result, Hocevar was unable to return to full-time work and remained on disability leave until her termination on June 7, 1996.

Following Hocevar's return to Minnesota in 1994, Amundsen engaged in hostile behavior in the workplace over a two-year period: he distributed sexually explicit material at business meetings; he made threats of violence towards female staff members; he <u>constantly</u> referred to women as "bitches," "fucking bitches," and "fat fucking bitches,"[3] he told stories of animal violence (e.g., placing a loaded gun in the

_____

[2]The timing of the reduction in Hocevar's sales territory is not clear from the record. Hocevar's affidavit indicates the reduction occurred in the summer of 1995. Hocevar's EEOC complaint, however, indicates the event occurred on September 5, 1995. The district court found the event occurred prior to her August 16, 1995, injury and disability leave. <u>See</u> Dist. Ct. Mem. and Order at 13.

[3]In setting forth the facts of this case, we explicitly recite the use of foul and offensive language. Unfortunately, such a recitation is necessary to accurately depict

mouth of a dog that wandered into his yard); he told jokes at meetings that were derogatory towards women and contained profanity; he introduced a new employee as the "fucking new guy;" and claimed that new pharmaceutical products were so exciting a physician would be "creaming his jeans" to get them. Hocevar also testified that Amundsen exhausted a portion of a staff meeting by playing an audiotape of the Jerky Boys which contained obscene, vulgar, and sexually explicit "prank" phone calls to businesses on topics such as genital warts.

Hocevar also testified that in April 1992, Purdue Regional Manager Paul Kasprzycki (Kasprzycki) had made sexual advances toward her at a bi-regional meeting in Denver, Colorado. She testified that she was afraid to report complaints to Kasprzycki (Amundsen's supervisor) due to incidents of Kasprzycki making unwelcome sexual advances towards her, including pulling her toward him resulting in "full body contact" during what began as a consensual "fast" dance that led into a "slow" dance. She testified that Kasprzycki made "very clear his wish to have a sexual relationship" with her and made suggestive comments about being available for a sexual relationship. Hocevar testified that Kasprzycki's advances were even more explicit when no witnesses were around. According to Hocevar, this was not an isolated incident, as Kasprzycki had previously made "unwelcome and uninvited" sexual advances toward her following a Purdue national meeting in New Orleans in January 1992. Then, in front of nearly 150 people Kasprzycki made statements at a bi-regional meeting in April 1995 implying a female manager had a sexual device in her hand and, in a separate incident, that he would be engaging in a sexual liaison in his hotel room later that day with three female sales representatives that had just performed a singing skit. Additionally, she describes an incident at a national meeting in Texas

the language used in order to provide a more precise sense of the work environment that existed at Purdue. Women in any work environment will be totally bewildered by the suggestion of Judge Beam that these terms are not sexual in content or demeaning to women.

in 1993 involving two other Purdue District Managers, Dan Mackavoy and Dick Silverman. Hocevar stated that the district managers talked throughout her presentation; afterwards, she approached them about their "rude" behavior, to which Mackavoy responded: "We were talking about what great legs you have."

In yet another incident, also following a Purdue bi-regional meeting, Hocevar and six male and female co-workers were discussing Susan Faludi's book Backlash:  The Undeclared War Against American Women (discussing public reaction to successful working women). During this conversation, a male employee called Hocevar a "bitch" and the then new district manager, Kelly Bartlett, became "very angry" and "exploded" stating: "You women, since when are women always right and men are always wrong? If your women's movement had its way, every woman would be working and our children would be being raised in communes." The incident was so upsetting that Kathy Kiekhaefer (Kiekhaefer) and a co-worker were crying and were "scared" and concerned at the prospect of working for a manager with such a feeling of hostility toward working women.

In October 1995, Hocevar complained to Dennis Merlo, a Purdue managerial employee, about Amundsen's inappropriate behavior, foul language, and stories of animal violence. On December 20, 1995, Hocevar's attorney notified Purdue of her intention to file a complaint against Purdue with the Minnesota Department of Human Rights alleging sexual harassment. The letter also voiced concerns about the "ongoing sexual harassment" of Hocevar and other women at Purdue. In January 1996, another female employee, Kiekhaefer, filed a claim of sexual harassment with Purdue, which prompted Purdue to investigate the complaints.

Danielle Nelson (Nelson), Purdue's Vice President of Equal Employment Opportunity Compliance and Human Resources Administration, conducted an investigation into the complaints of sexual harassment. Nelson found that Amundsen's extensive use of profanity and off-color jokes violated company policy and was

"unprofessional behavior." Nelson concluded, however, that no sexual harassment occurred. Despite Nelson's determination that no sexual harassment occurred, Purdue directed Amundsen – under threat of termination – to take a three month unpaid leave of absence during which he would receive counseling and management training. Thereafter, Nelson and James Lang (Lang), Purdue's National Sales Manager, traveled to Amundsen's district, informed the employees that Amundsen's language was inappropriate and unacceptable, and trained employees on Purdue sexual harassment complaint procedures. After the Nelson/Lang visit, Hocevar's co-worker Mary Beck-Johnson testified that workplace conduct "absolutely changed" – "personal" matters were no longer discussed and inappropriate language was no longer used at meetings.

In mid-April 1996, Amundsen returned from the unpaid leave of absence. On May 2, 1996, Hocevar filed a charge of sexual harassment with the Equal Employment Opportunity Commission (EEOC) and Purdue terminated her a little over a month later by letter dated June 7, 1996. Hocevar thereafter filed her claim alleging retaliatory discharge on July 10, 1996. Hocevar now appeals the district court's grant of summary judgment in favor of Purdue.

## II. DISCUSSION

### A. Retaliation

The district court found that Hocevar made a prima facie case of retaliation following her claim of sexual harassment with the EEOC. It found that (1) Hocevar had engaged in a statutorily protected activity;[4] (2) an adverse employment action

---

[4]An employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

occurred; and (3) the adverse employment action was casually linked to the protected activity.[5]    Nonetheless, the district court found that Purdue articulated a nondiscriminatory reason for termination, namely, the company's need to restaff her vacant position.[6]  The district court furthermore found that Hocevar had not shown evidence that Purdue's reason was pretextual.

Based on our de novo review of the record, we reverse the grant of summary judgment on Hocevar's retaliation claim.  The overall record establishes the plaintiff has demonstrated sufficient evidence, if believed, that the reason given for her discharge simply masked the true reason for the discharge – retaliation for filing an EEOC charge.  See Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978).[7] The record demonstrates several factors from which a trier of fact might infer that retaliation was the true reason for her discharge:

---

[5]The defendant seeks to refute that any adverse employment had taken place. Without getting into evidentiary detail, it is undisputed that Hocevar claims she lost her job for engaging in protected activity.  As the district court points out, Hocevar's discharge followed the protected activity so closely in time so as to create an inference of retaliating motive, citing Kiel v. Select Artificials, Inc., 142 F.3d 1077, 1080 (8th Cir. 1998), reh'g granted and opinion vacated (Jun. 5, 1998).

[6]In its letter terminating Hocevar, Purdue advised that it would make every effort to locate a suitable territory for her when she was certified as able to return to work. Purdue suggests this precatory offer of reinstatement constitutes sufficient immunity from a claim of retaliation.  Whether this offer to mitigate the harshness of discharge was sincere is a question of fact for the jury.  Whatever intended, it cannot serve to provide immunity from liability if Purdue retaliated against a person who engaged in a statutory protected right.

[7]The Supreme Court observed, "when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as [age]." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978).

(1) the close proximity in time between Hocevar's discharge and Amundsen's return to work after his three-month suspension without pay for sexual harassment as reported by Hocevar and others;

(2) the close proximity of Hocevar's filing the EEOC claim of sexual harassment and her discharge;

(3) that long prior to the company's reason for Hocevar's discharge, the Mayo Clinic account was taken away from the plaintiff and that account was unserviced for over three months thus depriving Hocevar of substantial sales commission;

(4) that Hocevar was targeted by Amundsen and Kasprzycki for preprobation in July 1995;

(5) that defendant had earlier refused to accommodate plaintiff's work restriction following a car accident, when defendant's own employment expert testified that such accommodation could have occurred;

(6) that Amundsen had required Hocevar to call him every day with a special report about her sales calls; no other employee was required to do so;

(7) that Kathy Kiekhaefer testified that employees who complained about their manager "eventually were gone from the organization altogether."

Hocevar's allegations, if proven true, evidence a long history of unfavorable actions by Amundsen against her virtually from the moment she was placed under his supervision. During the period in which Amundsen gave her the lowest possible performance ratings and placed her on probation, Hocevar consistently exceeded Purdue sales quotas and received bonuses. Hocevar's sales performance exceeded quota notwithstanding the fact that Amundsen removed a lucrative portion of her sales

territory and despite the offensive work environment and heightened scrutiny by Amundsen. After Hocevar notified Purdue of Amundsen's offensive behavior, Amundsen was forced to take an unpaid leave of absence. Less than a month after his return, Hocevar filed a sexual harassment claim and shortly thereafter was terminated.

Giving Hocevar the benefit of all favorable inferences on summary judgment, we hold there exists sufficient inference that the company's sudden need to restaff the Mayo Clinic territory was indeed questionable and that Hocevar's filing of her complaint with the EEOC was the motivating act that caused Amundsen to discharge her.

It is not for this court, nor for the district court, to weigh the evidence and decide whether Purdue's proffered reason was true. As long as there exists conflicting evidence upon which reasonable men and women might differ, we find sufficient evidence of pretext to survive the motion of summary judgment. Under the circumstances, we find the district court erred in granting summary judgment on Hocevar's retaliation claim. We, therefore, reverse the grant of summary judgment on Hocevar's claim of retaliation for the exercise of protected activity.

LAY, J. dissenting.

I dissent from the grant of summary judgment on the hostile work environment claim.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII protects "more than 'terms' and 'conditions' in the narrow

contractual sense." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786 (1998) (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78 (1998)) (internal quotation omitted). The Act evinces Congress' intention to define discrimination in the broadest possible terms, and neither enumerates specific discriminatory practices nor defines the breadth of actionable illegal activities. <u>See</u> <u>Hall v. Gus Constr. Co.</u>, 842 F.2d 1010, 1014 (8th Cir. 1988). In interpreting the scope of activities prohibited under Title VII, the Supreme Court instructs that hostile work environment harassment occurs when "the <u>workplace</u> is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working <u>environment</u>.'" <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (citations omitted and emphasis added).

In a sexual harassment suit, in order to establish a claim of hostile work environment, a plaintiff must show (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and membership in the protected group; and (4) that the harassment affected a term, condition or privilege of employment. <u>See</u> <u>Carter v. Chrysler Corp.</u>, 173 F.3d 693, 700 (8th Cir. 1999). If the harassment is perpetrated by a supervisor and the employee suffers a tangible employment action (e.g., demotion, undesirable reassignment, or discharge), the employer is vicariously liable for the supervisor's sexual harassment of the employee. <u>See</u> <u>Faragher</u>, 524 U.S. at 807-08; <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998). Important to my analysis is the Supreme Court's recent statement that sexually harassing behavior perpetrated by a supervisor has a "greater power to alter the environment" than similar actions of mere co-workers. <u>Faragher</u>, 524 U.S. at 805.

The inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). As I previously indicated, in considering a motion for summary judgment,

the district court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter, id. at 249, but instead should give all reasonable inferences to the non-moving party. Id. at 255. To survive summary judgment, Hocevar need only submit "'sufficient evidence supporting a material factual dispute that would require resolution by a trier of fact.'" Austin v. Minnesota Mining & Mfg. Co., 193 F.3d 992, 994 (8th Cir. 1999), (quoting Hase v. Missouri Div. of Employment Sec., 972 F.2d 893, 895 (8th Cir.1992)). Summary judgment is inappropriate where "reasonable minds could differ as to the import of the evidence." Anderson, 477 U.S. at 250. It is under this framework that we should review the district court's grant of summary judgment to Purdue on Hocevar's claims of hostile work environment.[8]

Hocevar asserts that during her tenure at Purdue, she endured a constant litany of vulgar and inappropriate behavior. As previously set forth, the behavior was perpetrated in large part by Amundsen, her direct supervisor, and, in small part, by two other Purdue managers.

As the district court found, there is no dispute that Hocevar, a female, is a member of a protected group. See Carter, 173 F.3d at 700 (female plaintiff member of protected group). Our inquiry, therefore, should turn to the second element of a hostile work environment claim: whether she was subject to unwelcome harassment.

---

[8]Under summary judgment, the burden is actually on the moving party to show the absence of a genuine dispute of material fact. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). I think it clear that the employer has not carried that burden.

Consideration of this matter is further guided by the principle that summary judgment should seldom be granted in employment discrimination cases since the claims frequently rely on inferences. See Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1156 (8th Cir. 1999) (citing Lynn v. Deaconess Med. Ctr.-West Campus, 160 F.3d 484, 486-87 (8th Cir. 1998)).

Conduct is "unwelcome" where it is "uninvited and offensive." Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1108 (8th Cir. 1998); see Moylan v. Maries County, 792 F.2d 746, 749 (8th Cir. 1986) (conduct is unwelcome where employee neither solicited it nor invited it, and regarded it as undesirable or offensive).

That the conduct in question is unwelcome is "[t]he gravamen of any sexual harassment claim." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986). In determining whether conduct is "unwelcome," we should consider whether the plaintiff indicated, by her conduct, that the alleged harassment was unwelcome. Quick v. Donaldson Co., 90 F.3d 1372, 1378 (8th Cir. 1996) (citing Meritor, 477 U.S. at 68). This is a fact question for the jury and turns largely on credibility determinations. See Meritor, 477 U.S. at 68 (question of whether conduct is unwelcome presents difficult proof problems turning largely on credibility determinations committed to trier of fact); see also Quick, 90 F.3d at 1378.

The district court focused its inquiry on whether the incidents of harassment were "offensive" and concluded that they failed to constitute an offensive environment due to their infrequent use.[9] Under review of the record, I find sufficient evidence and inference therefrom that there was an ongoing use of sexual vulgarity directed at the plaintiff as well as all women employees in general. Based on the evidence set forth below, the plaintiff has certainly met the threshold of proof of pervasiveness as a matter

---

[9]Before the district court, Purdue argued that the court should not consider alleged harassment that occurred prior to July 7, 1995, that is, 300 days prior to Hocevar's May 2, 1996, complaint to the EEOC. Hocevar argued the court should consider incidents prior to July 7, 1995, under a continuing violation theory, which permits consideration of allegedly discriminatory events outside the 300-day limitations period. See Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1302 (8th Cir. 1997). Although not expressly adopting the continuing violation theory, the district court implicitly agreed with Hocevar and considered behavior beginning in August 1994.

of law. The ultimate determination as to whether the harassment was pervasive must be made by the jury.[10]

The record in the present case shows Amundsen's use of sexual vulgarity occurred throughout the workplace, on sales calls and during meetings. Hocevar's female co-worker, Kiekhaefer, indicates Amundsen repeatedly referred to women as "bitches," used the "F" word in virtually every other sentence, called clients "fuckers" and "assholes," and routinely referred to female nurses and female physicians as "fucking bitches." Similar testimony is in the record from another female employee of Amundsen's, Mary Beck-Johnson, indicating Amundsen "routinely" used the terms "bitch" and "fuck" in meetings. Further, Hocevar testified that sexually explicit behavior occurred at meetings chaired by Amundsen, which Amundsen either condoned or failed to stop, and that sexually suggestive comments were made by two Purdue managers, one of whom subjected Hocevar to unwelcome physical contact during a consensual dance, which made Hocevar "extremely uncomfortable." Under the record presented, these vulgar attacks cannot be simply regarded as "off-hand" or isolated incidents.

---

[10]The opinion by Judge Beam takes a different approach, suggesting that Hocevar cannot prove the behavior was unwelcome because she had on occasion used similar language, relying on Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 966 (8th Cir. 1999). In Scusa, the hostile work environment plaintiff alleged, among other incidents, one occurrence of foul language used by a co-worker during a meeting discussing her sexual harassment claim. See Scusa, 181 F.3d at 963 n.3. On the question of whether the plaintiff found the offensive language "unwelcome," this court observed that the record contained undisputed evidence that the plaintiff herself used the "F" word along with male-specific pejoratives, told off-color jokes at work, and teased co-workers. Id. at 966. This court affirmed the district court's finding that Scusa failed to create a genuine issue of material fact to preclude summary judgment on the question of whether the alleged behavior was unwelcome. In contrast to Scusa, the sexual vulgarities were used not once, but "constantly" by Hocevar's supervisor.

-13-

The defendant, as does Judge Beam, relies on the fact that Hocevar herself had used the words "bitch" and "fuck" on occasion in the workplace. On this basis, it is argued that the words are not unwelcome by Hocevar. Hocevar, however, qualifies her use of these words by saying that they were not used in the same context that Amundsen had used them. There is a world of difference between the use of the infrequent swear word in the workplace, not actionable when not directed to a specific gender, and direct words demeaning to women in general. While Hocevar's infrequent use of foul language may indeed, when presented to a jury, diminish her claim that the behavior of Amundsen and others was "unwelcome," it in no way bars her claim as a matter of law. I am unaware of any case that precludes a plaintiff from arguing that the employer's constant use of sexually charged language and off-color jokes is unwelcome merely because the plaintiff at times engaged in swearing. Such a reading is inconsistent with the mandate that courts consider the totality of the circumstances of a case. Faragher, 524 U.S. at 787. Further, Judge Beam's analysis utterly fails to address Amundsen's threats of violence, his dissemination of sexually explicit material at meetings, his condonation of sexually graphic behavior at meetings, and the behavior of other Purdue managers, all apparently because Hocevar admitted to the infrequent use of foul language. The record further shows that Hocevar's swearing was not directed as a demeaning word of harassment at any person or group of people. It is one thing that an employee use vulgarity in his or her general communication; it is quite another when the vulgarity is directed at a specific social group who reasonably could find it to be demeaning to their own self-being.

Even if one concedes that use of foul language by an employee can diminish a claim that the harassment was unwelcome and subjectively offensive, evidence of Hocevar's reaction could still support a finding that Amundsen's behavior was unwelcome. See Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 964 (8th Cir. 1993) (agreeing with district court that plaintiff having posed nude for a nationally distributed magazine does not lead inevitably to conclusion that workplace harassment was welcome); Bales, 143 F.3d at 1108-09 (plaintiff's reaction to harassment sufficient

to support jury finding that behavior was unwelcome); see also Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1223 (8th Cir.1997) ("[I]t stretches credulity to conceive that a reasonable jury might have thought [plaintiffs] welcomed from their co-workers the conduct detailed in the evidence at trial.").

Hocevar testified that she suffered fear, depression, anxiety and self-doubt as a result of Amundsen's behavior, including his degrading and demeaning criticism of her work performance. If she was not offended by this, as I think any reasonable person would be, it is difficult to explain that both she and her co-worker were under the continuing care of a psychologist and that Hocevar was treated with Prozac for anxiety and depression. Hocevar's complaint to Purdue manager Dennis Merlo is also "reaction" evidence revealing that Hocevar viewed Amundsen's sexually derogatory language unwelcome. Further, the record contains evidence that Hocevar, Kiekhaefer, and a third female co-worker were "scared" and upset to the point of tears following the incident surrounding the discussion of Susan Faludi's book Backlash: The Undeclared War Against American Women. Giving her the benefit of all favorable inferences, this conduct could be found by a jury to support a finding that the harassment was unwelcome and that it was subjectively offensive.[11] Precedent supports such a finding. See Harris, 510 U.S. at 22 (recognizing that Title VII bars discriminatory conduct that affects a reasonable person's psychological well-being); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993) (psychological harm is a relevant factor in hostile work environment analysis); cf. Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1304 (8th Cir. 1997) (recognizing that a callous pattern

_____

[11]The Supreme Court directs that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Because Purdue does not appear to suggest that the harassment was not objectively offensive, this issue is not addressed.

and practice of degrading sexual harassment in the workplace can destroy self-esteem of women exposed to it).

The third element of a claim of hostile work environment requires evidence of a causal nexus between the harassment suffered and Hocevar's membership in a protected group.  See Carter, 173 F.3d at 700.  At the summary judgment stage, a plaintiff may prove harassment is "based on sex" by presenting evidence that members of one sex were the primary targets of harassment.  Quick, 90 F.3d at 1378 (evidence that members of one sex were primary targets of harassment sufficient to show conduct was gender based for purposes of summary judgment) (quoting Kopp, 13 F.3d at 269-70).  Whether harassing conduct is based on sex is determined by inquiring "whether 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  Quick, 90 F.3d at 1379 (quoting Harris, 510 U.S. at 25) (Ginsburg, J., concurring).

This court has recently reaffirmed that gender-based insults, such as the term "bitch," may give rise to an inference of discrimination based on sex, see Carter, 173 F.3d at 700, and has rejected the notion that an employee must be propositioned, touched offensively, or harassed by sexual innuendo in order to have been sexually harassed.  See Quick, 90 F.3d at 1379 (citing Burns, 989 F.2d at 964).  Additionally, we have held that intimidation and hostility toward women in general can result from conduct other than explicit sexual advances.[12]  See Hall, 842 F.2d at 1014.  Moreover, it is well settled that verbal abuse, violence, or physical aggression may constitute sexual harassment, see Quick, 90 F.3d at 1379 (citing Burns, 989 F.2d at 964-65), and

---

[12]Indeed, Justice Scalia recently pointed out that harassment does not have to be motivated by sexual desire, but can be motivated by hostility to members of a particular sex.  See Oncale, 523 U.S. at 80 ("A trier of fact might reasonably find such [same-sex] discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.").

-16-

that such need not be explicitly sexual in nature. See Carter, 173 F.3d at 700-01 ("All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus."); see also, Williams v. General Motors Corp., 187 F.3d 553, 565-66 (6th Cir. 1999) (gender-specific epithets such as "slut" and "fucking women" can support an inference that the comments were motivated by gender).

On the question of causal nexus, the district court essentially reasoned that because the offensive behavior occurred in front of both men and women and was not specifically directed at Hocevar, it failed to evidence the harasser's thoughts toward a particular gender. Similarly, Judge Beam holds that because Amundsen indiscriminately used the crude adjective "fucking" when referring to both men and women, the term somehow loses its sexual connotation and cannot be used to show the language was causally linked to gender. He finds that "[t]his is not a case where Amundsen used the term bitch as a synonym for female-specific characteristics of which he did not approve." This reasoning is inconsistent with this court's decision in Kopp where we found sufficient evidence of actionable harassment based on sex to survive summary judgment where women were more frequently exposed to harassment than men, despite that abuse was rarely couched in terms of sex or gender and was used in front of both men and women. Kopp, 13 F.3d at 269-70. Judge Beam's opinion further fails to appreciate the inherently sexual nature of the profane term,[13] and also fails to address Amundsen's chronic characterization of women as "bitches," "fucking bitches," and "fat fucking bitches."

---

[13]The American Heritage Dictionary, New College Edition, defines "fuck" as: "1. *Vulgar.* To have sexual intercourse with. 2. *Vulgar Slang.* To deal with in an aggressive, unjust, or spiteful manner." p. 531.

Contrary to Judge Beam's conclusion,[14] Hocevar presents the hypothetical case we considered in Kriss where a supervisor's constant use of the word "bitch" was directed only at women. It is apparent that Amundsen used the term "bitch" throughout the workplace in a pejorative manner to describe women who were rude to him or

---

[14]In support of the proposition that "bitch" is not indicia of a misogynist attitude, Judge Beam cites Kriss v. Sprint Communications Co., 58 F.3d 1276, 1281 (8th Cir. 1995). In Kriss, we reversed the district court's finding of gender discrimination following a bench trial. Kriss' supervisor had once stated that a woman in the office was a "bitch." This court considered the supervisor's use of that term and wrote:

Specifically, the word "bitch," it seems to us, is not an indication of a general misogynist attitude. Rather, it is a crude, gender-specific vulgarity, which in this case was directed toward only one woman, rather than women in general. (We note the existence of many vulgar epithets that are used only of men that, we believe, would not be indicative of animus against males.) Hence, we do not find Miller's use of this term to be particularly probative of gender discrimination. Perhaps if the evidence were that Miller regularly used the word "bitch" as a synonym for "complain," the plaintiff's case would be stronger, because that would furnish some evidence that Miller associated complaining with females.

Id. (emphasis added).

behaved in some way that displeased him.[15]  This term also has a distinctively negative connotation when used to describe women.[16]

Giving Hocevar the benefit of all reasonable inferences, there is little doubt that the extensive use of the gender-specific pejorative "bitch," coupled with the sexually explicit and offensive term "fuck," could support a finding that the harassment was based on sex.  To hold otherwise is an unprecedented endorsement of the sexually insulting behavior presented.  See Burns, 989 F.2d at 965 (vulgar and offensive epithets, including but not limited to "bitch," are "'widely recognized as not only improper but as intensely degrading, deriving their power to wound not only from their meaning but also from the disgust and violence they express phonetically.'") (citations and internal quotations omitted).

The Supreme Court recently reaffirmed the "severe or pervasive" test articulated in Harris, defining a sexually objectionable environment to mean "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Faragher, 524 U.S. at 787; see Ellerth, 524 U.S. at 754.  Once there is evidence of improper conduct and subjective offense, the question of whether the conduct rose to a persuasive level of abuse is largely one for the jury.  See Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998); see also O'Shea v. Yellow Tech. Servs., Inc.,

---

[15]Hocevar testified through deposition about an incident in which a female physician backed she and Amundsen out a door, refusing to allow them to visit another physician.  Hocevar testified that Amundsen became "very angry," was "ranting and raving" and said "I wish I was in the military again or, like, a cop, because I'd like her to fear me.  I should go up there and slam her one." Throughout the day, Amundsen repeatedly referred to the female physician as a "fat fucking bitch" and a "fucking bitch."  This single incident gives a clear understanding of the hostile context in which Amundsen used these offensive terms.

[16]The American Heritage Dictionary, New College Edition, defines "bitch" as: "*Slang*.  A spiteful or lewd woman."  p. 135.

185 F.3d 1093, 1098 (10th Cir. 1999) ("the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is 'quintessentially a question of fact'") (quoting <u>Beardsley v. Webb</u>, 30 F.3d 524, 530 (4th Cir. 1994)).

In determining whether a work environment is sufficiently severe or pervasive to alter the terms or conditions of employment, we must look at the totality of the circumstances, including factors such as "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Faragher</u>, 524 U.S. at 787-88 (quoting <u>Harris</u>, 510 U.S. at 23). Evidence of psychological harm to the plaintiff is also a relevant factor, <u>Harris</u>, 510 U.S. at 23, as is evidence of harassment of plaintiff's co-workers. <u>See</u> <u>Howard</u>, 149 F.3d at 838 (harassment of plaintiff's co-workers relevant to show pervasiveness of hostile environment).

Under this framework, we should consider the fourth element of a claim of hostile work environment harassment, namely, whether the harassment Hocevar suffered affected a term, condition or privilege of her employment. This court has held that in the context of Title VII "conditions of employment" may be altered by harassment if the employee is discouraged from remaining on the job, <u>Smith v. St. Louis Univ.</u>, 109 F.3d 1261, 1264 (8th Cir. 1997), or the harassment caused economic injury, affected the employee's psychological well-being, detracted from job performance, or kept the employee from advancing in her career. <u>Quick</u>, 90 F.3d at 1378. Title VII is violated when a "workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive <u>working environment</u>,'" where if the environment is objectively and subjectively perceived as hostile or abusive. <u>Id.</u> (quoting <u>Harris</u>, 510 U.S. at 21) (emphasis added).

-20-

On the question of whether Hocevar showed sufficient evidence that the harassment was "severe or pervasive" to alter a term or condition of employment, the district court found the alleged incidents were neither sufficiently pervasive nor directed at Hocevar.[17]  In reaching this conclusion, the district court concluded that playing the Jerky Boys tape was not offensive conduct; that Amundsen's stories of animal violence are not severe enough to constitute a hostile environment; that Amundsen's referral to a female doctor as a "fucking bitch" and introduction of a new employee as a "fucking new guy" at most offended the person the comments were directed at, which was not Hocevar.  On this point, Judge Beam recognizes that the use of foul language may have been pervasive.  Because he concludes that the offensive language is not based on sex, however, he sets this evidence aside, then proceeds to consider whether the remaining facts of Hocevar's case are sufficiently severe or pervasive.  This approach errs because it fails to consider the totality of the circumstances, see Harris, 510 U.S. at 23 (all evidence concerning abusiveness of a plaintiff's working condition is relevant), and imposes a per se test requiring harassment be "directed at" plaintiff to be actionable.  This approach has been rejected by an appellate court in Vinson v. Taylor, 753 F.2d 141, 146 (D.C. Cir. 1985), which expressly held that "[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive."  Id. (emphasis added).  The Vinson court reached this conclusion in light of EEOC Decision No. 71-909, 3 Fair

---

[17]The defendant asserts this was not a basis for the district court's summary judgment grant.  To the contrary, the court stated:

> Because none of the alleged harassment was directed at Hocevar, and because the incidents were infrequent, the allegations fail to be sufficiently pervasive and severe enough to alter the conditions of her employment and create an abusive working environment.  Thus, Defendant's motion for summary judgment on Count 1 is granted.

Dist. Ct. Mem. and Order at 9.

-21-

Empl. Prac. Cas. (BNA) at 269-70 (1970) in which the EEOC found reasonable cause to find a Title VII violation where a white employee was discharged for befriending African American co-workers.[18]

Title VII provides employees the "right to work in an <u>environment</u> free from discriminatory intimidation, ridicule, and insult." <u>Meritor</u>, 477 U.S. at 65 (emphasis added). The <u>EEOC Guidelines defining sexual harassment do not limit sexual harassment to only those actions that are directed at the plaintiff</u>. <u>See</u> 29 C.F.R. § 1604.11 (1999) ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work performance <u>or creating an intimidating, hostile, or offensive working environment</u>.") (emphasis added).

I find no case that dictates, as Judge Beam suggests, that only behavior <u>directed</u> at the plaintiff, such as sexual advances, may support a claim of hostile work environment sexual harassment. <u>Cf.</u> <u>Breeding</u>, 164 F.3d at 1159 (considering

---

[18]The EEOC stated that an employer violates Title VII by maintaining a work environment in which racial insults are countenanced. It stated that Title VII requires an employer:

> maintain a working atmosphere free of racial intimidation or insult. Failure to take steps reasonably calculated to maintain such an atmosphere violates the Act. . . . That the racial insults were not directed to [white] Charging Party, but to his fellow employees, renders the act no less a violation. Indeed, Charting Party was so offended by the epithet and the attitude underlying its use that he determined to resign his employment. That Charging Party was "aggrieved" in fact and as a matter of law is well settled.

EEOC Decision No. 71-909, 3 Fair Empl. Prac. Cas. (BNA) at 269-70 (1970).

supervisor's fondling of genitals in view of various employees, including plaintiff, and inappropriate comments made in front of men and women); Howard, 149 F.3d at 838 (considering harassment of employees other than plaintiff relevant to show pervasiveness of hostile environment); Kopp, 13 F.3d at 270 (reversing grant of summary judgment where male physician used gender-specific foul language in front of numerous employees, both male and female, only one incident of which was directed at plaintiff); Jenson v. Eveleth Taconite Co., 824 F. Supp. 847 (D. Minn. 1993) (class plaintiffs prevailed on hostile work environment claim where much of derogatory and insulting language used by men was directed at women in general). The fact that the bulk of the harassing behavior occurred in Hocevar's workplace in her presence yet was directed at all women present does not, as a matter of law, preclude a finding of a hostile work environment. This is particularly true where the harassment occurred at the hands of Hocevar's direct supervisor, in light of the Supreme Court's recent statement that harassing behavior perpetrated by a supervisor has a "greater power to alter the environment" than similar behavior of mere co-workers. Faragher, 524 U.S. at 805.

It is inconceivable at the summary judgment stage to suggest that the language used by Timothy Amundsen, Hocevar's supervisor, coupled with the behavior of two Purdue managers, is insufficient as a matter of law to support a claim of hostile work environment harassment under Title VII. Justice Scalia's recent observation is appropriate here, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale, 523 U.S. at 81-82.

I disagree with Judge Beam who perceives this to be a case of isolated or sporadic incidents of "mere offensive utterances" in the workplace. Assuming Hocevar's allegations as true at this early stage of summary judgment, the record reveals a clear pattern of pervasive offensive behavior tinged with gender animus.

Hocevar provides evidence that she was physically afraid of Amundsen, particularly after an incident in which he punched a fellow employee, and that she found his demeaning behavior toward women so humiliating that she sought psychiatric treatment and medication. The allegations, if found true by a jury, are sufficient to permit a finding that the cumulative effect of Amundsen's conduct, along with that of other Purdue managers, was sufficiently severe or pervasive to create a hostile work environment based on sexual harassment.

I therefore dissent from the affirmance granting summary judgment for hostile work environment in violation of Title VII.

BEAM, Circuit Judge, with whom Judge John R. Gibson joins in the result reached in Part IIA.

Marcia Hocevar appeals the district court's[19] grant of summary judgment in favor of Purdue Frederick Company (Purdue) and Timothy Amundsen, resulting in the dismissal of her Title VII claims of hostile work environment and retaliation.[20] The

---

[19]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

[20]Hocevar also brought claims of *quid pro quo* harassment in violation of Title VII, and state law claims of intentional infliction of emotional distress, breach of contract, and wrongful discharge. The district court dismissed Amundsen as a party. The district court also dismissed the *quid pro quo* claim on summary judgment. After dismissal of the Title VII claims, the district court declined to exercise supplemental jurisdiction over the state law claims. At oral argument, Hocevar's counsel seemed to imply that Hocevar did not wish to pursue an appeal of the dismissal of her *quid pro quo* claim. Regardless, we affirm the district court's well-reasoned opinion with regard to the dismissal of the *quid pro quo* allegation. Hocevar does not appeal the dismissal of Amundsen as a party or the district court's decision to not exercise supplemental jurisdiction over the state law claims.

district court found that Hocevar had not established a *prima facie* case of hostile work environment and that she had not demonstrated a retaliation claim.

## I.    BACKGROUND

I relate the relevant facts in the light most favorable to Hocevar.[21]  Hocevar worked as a sales representative for Purdue.  During Hocevar's employment, her supervisor, Timothy Amundsen, constantly used the words "bitch," "fuck, " and "asshole," and sometimes used combinations of these words.  Aside from her claims of constant offensive language, Hocevar also asserts four specific instances of inappropriate conduct by Amundsen.  First, Amundsen called a female client who treated him rudely a "fat fucking bitch."  Second, Amundsen called a new male employee a "fucking new guy" throughout a business meeting.  Third, at a business meeting, Amundsen played a tape of the Jerky Boys, a set of crude, so-called comedians whose routine often includes offensive language.  Fourth, Amundsen said that Purdue's clients would "cream their jeans" when they found out about a new product that Purdue had developed.

Hocevar cited four other incidents of sexual harassment involving other company officials.  First, in the spring of 1992, while having drinks, several company employees engaged in a heated argument about Susan Faludi's book *Backlash*.  During that argument, a company official expressed negative feelings about the feminist movement

---

[21]We review the district court's grant of summary judgment *de novo*, and will affirm if the evidence, viewed in the light most favorable to Hocevar, shows that there is no genuine issue of material fact and that Purdue is entitled to judgment as a matter of law.  See Austin v. Minnesota Mining and Mfg. Co., 193 F.3d 992, 994 (8th Cir. 1999) (standard of review).

and another company official called Hocevar a "bitch."[22]  Second,  in January of 1993, another company official made sexual advances toward her and pulled her close to have full-body contact during a dance at a company gathering.  Third, at a company meeting in the spring of 1993, two other company officials talked during a presentation that Hocevar was giving.  At the end of the presentation, Hocevar confronted them about their rude behavior and one of the men told her that they had been talking about "what great legs" Hocevar had.  Fourth, in April of 1995, after a skit performed by three female employees at a company gathering, a company official[23] suggested to the room of 150 people that he would be having a sexual liaison with the three women later that evening.  During this same gathering, the company official also made a comment that suggested a female employee had a sexual device in her hand.

In August of 1995, Hocevar was injured in a car accident in which she received injuries that kept her off work for several weeks.  On September 18, 1995, Hocevar returned to work.  However, she was only able to work for a little more than a month before having to take another absence because of continuing pain from injuries sustained in the accident.  On December 15, 1995, Purdue sent a letter to Hocevar in which the company expressed concern about her continued absence.  Five days later, Hocevar's attorney responded with a letter that outlined Hocevar's complaints about Amundsen's conduct.  On May 2, 1996, Hocevar filed a complaint with the EEOC. About a month after the complaint was filed, Purdue terminated Hocevar.

---

[22]The company official who called Hocevar a "bitch" later called to apologize for his comment.

[23]This was the same company official who danced with Hocevar two years earlier.

## II.   DISCUSSION

### A.   Hostile Work Environment

To succeed on a claim of hostile work environment created by her supervisor, Hocevar has to prove the elements of such a case.  These elements are: (1) that she is a member of a protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition, or privilege of employment.  See Phillips v. Taco Bell Corp., 156 F.3d 884, 888 (8th Cir. 1998).  Purdue has an affirmative defense to liability or damages when no tangible employment action is taken if: (a) Purdue exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) Hocevar unreasonably failed to take advantage of any preventive or corrective opportunities provided by Purdue or to avoid harm otherwise.  See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).   Hocevar is a member of a protected group.  However, Hocevar has failed to establish that the alleged behavior was unwelcome, the discrimination was based on sex, or that the harassment affected a term, condition, or privilege of employment.[24]

Hocevar has not demonstrated that Amundsen's use of offensive language was unwelcome.  A plaintiff must indicate by her conduct that the alleged harassment was unwelcome.  See Quick v. Donaldson Co., 90 F.3d 1372, 1378 (8th Cir. 1996).  A plaintiff cannot create a genuine issue of material fact with regard to unwelcome behavior when she engages in the conduct complained about.  See Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 966 (8th Cir. 1999).  Hocevar's own testimony indicates that

---

[24]Because Hocevar has failed to prove the elements of her claim, we need not decide the availability of or extent of an affirmative defense.

Amundsen's use of offensive language was not unwelcome because she used the offensive language herself. Hocevar admitted that she also called the new co-worker the "fucking new guy" at the business meeting. She further admitted that she used the words "bitch" and "fuck" around both Amundsen and other Purdue employees. I find that these actions on the part of Hocevar vitiate her contention that the mere use of these words was unwelcome.

Hocevar also failed to establish that the discrimination was based on sex. Harassing conduct constitutes discrimination based on sex when members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. See Montandon v. Farmland Indus. Inc., 116 F.3d 355, 358 (8th Cir. 1997). Hocevar failed to demonstrate that the language complained about was based on sex. Offensive language was used to describe both men and women. While Amundsen described a *female* client who had treated him rudely as a "fat fucking bitch," he also referred to a new *male* employee as a "fucking new guy." Offensive language was used in front of both men and women at company meetings and the Jerky Boys tapes were played in front of both men and women. The use of foul language in front of both men and women is not discrimination based on sex. See id. at 358; see also Scusa, 181 F.3d at 965.

Hocevar claims that Amundsen's use of the term "bitch" itself shows a discriminatory attitude toward females. Gender-based insults may create an inference that discrimination was based on sex. See Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999). However, mere use of the word "bitch," without other evidence of sex discrimination, is not particularly probative of a general misogynist attitude. See Kriss v. Sprint Communications Co., 58 F.3d 1276, 1281 (8th Cir. 1995).

In this case, Hocevar has presented no additional evidence demonstrating that Amundsen's use of the word "bitch" connotes a misogynist attitude. This is not a case where Amundsen used the term bitch as a synonym for female-specific characteristics

of which he did not approve. See id. at 1281 (noting that evidence where supervisor used word "bitch" as synonym for "complain" would provide stronger evidence of sex harassment because that would demonstrate that supervisor associated complaining with females). Neither is this a case where Amundsen blamed Hocevar's sexuality for his use of the word "bitch." Carter, 173 F.3d at 701 (holding that use of sexual epithets is evidence of sexual harassment when co-employee claims he used sexual epithets because plaintiff dressed provocatively and put "her ass up in our faces"). Nor is this a case in which Amundsen engaged in a litany of obscene name calling against Hocevar. See Burns v. McGregor Elec. Indus. Inc., 989 F.2d 959, 964 (8th Cir. 1993) (finding discrimination based on sex when male co-worker called female plaintiff a "bitch," "asshole," "slut," and "cunt"). Because Hocevar has failed to present any additional evidence to bolster her contention that Amundsen's pervasive use of the term "bitch" shows his misogynist attitude, I find that Hocevar cannot demonstrate the harassment was based on sex.

Finally, Hocevar cannot show that the harassment was sufficiently severe or pervasive so as to alter a term, condition, or privilege of employment. See Taco Bell, 156 F.3d at 888. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview." Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 81 (1998). Factors to consider when determining whether sexual harassment is sufficiently severe or pervasive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys. Inc., 510 U.S. 17, 23 (1993). More than a few isolated instances are required. See Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir. 1997). While the use of foul language may have been pervasive, I have already concluded that it was neither unwelcome nor based on sex.

This leaves Hocevar with four events that might constitute unwelcome behavior based on sex: (1) the *Backlash* incident; (2) the "great legs" incident; (3) the dancing incident; and (4) the skit incident. I will assume that all of these incidents could constitute unwelcome behavior based on sex. However, these incidents were clearly not pervasive because they occurred over at least a three-year period. In addition, a few inappropriate comments and an unwanted slow dance do not amount to particularly severe conduct that was threatening or humiliating.

I have little doubt that Amundsen's behavior was boorish and unprofessional. But, Title VII is not a general civility code. See Faragher, 524 U.S. at 788. The simple fact is that the cases on which Hocevar relies involved far, far more evidence than Hocevar has presented. See Rorie v. United Parcel Serv., 151 F.3d 757 (8th Cir. 1998) (reversing summary judgment against plaintiff where supervisor patted female employee on back, brushed up against her, told her she "smelled good," always "came-on" to her, and asked her about co-worker's penis size); Howard v. Burns Bros. Inc., 149 F.3d 835 (8th Cir. 1998) (affirming jury verdict where co-employee always used sexual innuendos, told plaintiff she had nice legs, brushed her buttocks, told jokes involving lewd gestures, and touched the buttocks of and talked "nasty" to other female employees); Hall v. Gus Constr. Co., 842 F.2d 1010 (8th Cir. 1988) (upholding judgment when plaintiffs' male co-workers made repeated requests for sex and touched plaintiffs' breasts and thighs). While I sympathize with Hocevar's having to endure Amundsen's conduct, her assertions fall far short of proof of a hostile work environment.

**B.    Retaliation**

To establish a *prima facie* retaliation case, Hocevar must prove that: (1) she engaged in protected activity; (2) Purdue took adverse action against her; and (3) there is a causal connection between the two. See Scott v. County of Ramsey, 180 F.3d 913, 917 (8th Cir. 1999). If Hocevar establishes a *prima facie* case, a presumption of

retaliation arises, and the burden then falls on Purdue to advance a legitimate reason for the adverse employment action. See id. If Purdue advances a legitimate reason, the presumption drops out and Hocevar has the burden of demonstrating intentional retaliation. See id. If there is no direct proof of retaliation, as here, a claimant may, under some circumstances, advance indirect proof by evidence that the so-called legitimate reason is merely a pretext for unlawful retaliatory conduct. See id. I find that Hocevar established a *prima facie* case of retaliation. However, I also find that Purdue advanced a legitimate reason for Hocevar's termination and that Hocevar presented no evidence of pretext.

Hocevar engaged in protected activity when she lodged a complaint with the EEOC on May 2, 1996. Purdue then took an adverse employment action against Hocevar by terminating her on June 7, 1996.[25] Finally, she established an inference of a causal connection because her termination closely followed the filing of her EEOC complaint and also closely followed Amundsen's return from a three-month suspension received, in part, because of Hocevar's complaints to Purdue officials. See Smith v. Riceland Foods, Inc., 151 F.3d 813, 819-20 (8th Cir. 1998) (causal connection established by circumstantial evidence, including close proximity of time between plaintiff's engagement in protected activity and the adverse employment action).

However, Purdue presented a legitimate reason for Hocevar's termination. In its termination letter, Purdue expressly noted that Hocevar was dismissed because of the need to re-staff her territory due to her lengthy absence. Hocevar does not dispute her absence from work for more than seven months, and I have little doubt that Purdue has

---

[25]Hocevar received poor performance evaluations in late-1994 and early-1995, and she had two major accounts removed from her sales territory in June of 1995. However, these are not adverse employment actions for the purpose of her retaliation claim because these events occurred well before Hocevar filed her complaint with the EEOC, the event which, according to Hocevar, triggered the retaliatory conduct. I also note that these events lend no aid to Hocevar's hostile work environment claim.

a legitimate need to have its sales territories covered. Thus, I find it was legitimate for Purdue to terminate Hocevar in order to re-staff her vacant sales territory.

Hocevar argues that the legitimate reason advanced by Purdue is a pretext for retaliation because: (1) Purdue failed to re-staff another important sales territory for three months and (2) a similarly situated employee who did not complain to the EEOC was not terminated by Purdue. As an initial matter, it does not appear that Hocevar made these arguments to the district court. See Womack v. City of Bellefontaine Neighbors, 193 F.3d 1028, 1032 (8th Cir. 1999) (declining to address arguments first advanced on appeal). However, even assuming that these arguments were advanced below, she has not provided evidence of pretext.

The fact that Purdue left another territory unstaffed for three months does not amount to pretext. Perhaps if Purdue had terminated Hocevar after three months, this would be somewhat persuasive. However, Hocevar's territory was left unstaffed for seven months–more than double the amount of time that Hocevar claims another territory was left unstaffed. Because of the significant difference in the amount of time that Hocevar's territory remained unstaffed, Purdue's failure to re-staff another territory for three months provides no evidence of pretext.

Hocevar's contention about an allegedly similarly situated employee also fails. Hocevar presented evidence that Purdue did not terminate another sales representative who also expressed concern about Amundsen's conduct but who did not file an EEOC complaint. Where the only evidence of pretext is disparate treatment when compared to another employee, a plaintiff must show that the other employee was similarly situated in all relevant aspects. See Scott, 180 F.3d at 917. In this case, the other sales representative and Hocevar were not similarly situated in all relevant aspects because the other sales representative was never absent from work. Thus, Purdue's retention of the other sales representative provides no support for Hocevar's allegations of pretext.

## III.  CONCLUSION

For the foregoing reasons, I would affirm the district court's dismissal of the hostile work environment claim.  I would also affirm the district court's decision on the retaliation claim.

JOHN R. GIBSON, Circuit Judge, concurring specially in affirmance of grant of summary judgment on hostile work environment claim.

I concur separately in the decision to affirm judgment against Hocevar on her hostile environment claim.  I do not concur in Judge Beam's opinion, because I believe it engages in fact finding, see supra at 5-6, and an unnecessary semantic dissection of the language in question.  I recognize that our decision in Kriss v. Sprint Communications Co., 58 F.3d 1276, 1281 (8th Cir. 1995), stated that "the word 'bitch' . . . is not an indication of a general misogynist attitude," but I do not read Kriss as establishing a test as to whether this word is inherently of a sexually harassing nature. It is beyond question that the repetitive use of the word in this case was demeaning to females, and the discipline which Purdue Frederick imposed on Amundsen, who used the word, shows that the company recognized the utterance was improper.

Even unquestionably offensive words do not necessarily make a hostile work environment, without considering the context. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (use of words having sexual content or connotations not necessarily discrimination because of sex).  I have examined the whole record and conclude that the facts taken in the light most favorable to Hocevar do not add up to a hostile work environment case.

At the outset, it is necessary to focus on the key facts.  I believe that the only conduct on the record that might be substantial enough to alter a term, condition, or

privilege of employment, see Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993), is Amundsen's use of sexual vulgarities. The other allegations about Amundsen's conduct, such as his involvement in a bar fight and his statements to employees at sales meetings that if sales did not improve, he was "going to kill you" or "kill your dog," do not appear to be gender-related. See Oncale, 523 U.S. at 80 (to be actionable, harassment must be discrimination because of sex). Hocevar's complaints about people other than Amundsen are based on incidents that were simply too few and far between to make a hostile environment.

Hocevar alleges that Amundsen chronically used foul language, specifically the words "fuck" and "bitch." In a letter dated December 20, 1995, Hocevar's counsel notified Purdue Frederick that Amundsen had engaged in ongoing sexual harassment against Hocevar. In January 1996 Purdue Frederick investigated the complaint. The investigation revealed that the members of the Viking District interviewed had "all participated in the use of profanity and, from time to time, off-color jokes. And the general consensus was that they carried it too far." In particular, the investigator concluded that Hocevar herself had participated in the profanity and improper jokes. Hocevar admitted at her deposition in this case that she used the same offensive language around Amundsen and other sales representatives. A Purdue personnel representative traveled to the Viking District in February to inform the employees there that the firm expected a high level of professionalism and that the investigation revealed that "perhaps there had been some deterioration in that professional standard" with the use of profanity and jokes. Amundsen was put on a three-month leave and required to undergo counseling and training. This discipline resulted in an improvement in Amundsen's language, as well as that of the other employees.

Hocevar complains most specifically of an incident in September 1994, at Dr. Kubics's office, in which Amundsen became enraged at being treated disrespectfully by a female doctor. Amundsen repeatedly referred to the doctor as a "fat fucking bitch," and talked about how he would like to "slam her one" and make her fear him.

In deciding when inappropriate conduct rises to the level of a hostile environment that changes a term or condition of employment, courts must look at all the circumstances. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or <u>a mere offensive utterance</u>; and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at 23 (emphasis added). In this regard, it is important that the conduct complained of consists only of "offensive utterances" of a type Hocevar herself engaged in at work, and that to the extent the gender-based utterances were threatening or abusive, they were not aimed at Hocevar, but at the female doctor, who was not a Purdue employee.

"We have considered harassment of <u>employees</u> other than the plaintiff to be relevant to show pervasiveness of the hostile environment." <u>Howard v. Burns Bros., Inc.</u>, 149 F.3d 835, 838 (8th Cir. 1998) (emphasis added). However, in the cases in our circuit where we have considered conduct directed at others in upholding sexual harassment claims, that conduct augmented evidence of harassment directed at the plaintiff, <u>see, e.g.</u>, <u>id.</u> (evidence of harassment of others augmented evidence of physical contact of plaintiff and chronic innuendos); <u>Hall v. Gus Constr. Co.</u>, 842 F.2d 1010, 1015 (8th Cir. 1988) (each plaintiff endured abuse). Abuse directed at a third party is part of the picture, but it is less significant than abuse directed at the plaintiff. <u>See</u> <u>Gleason v. Mesirow Fin., Inc.</u>, 118 F.3d 1134, 1144-45 (7th Cir. 1997) ("Second hand harassment" not as great an invasion as harassment directed at plaintiff); <u>Black v. Zaring Homes, Inc.</u>, 104 F.3d 822, 826 (6th Cir. 1997) (fact that most comments not directed at plaintiff contributes to conclusion of insufficiency of evidence). <u>But see</u> <u>Leibovitz v. New York City Transit Auth.</u>, 4 F. Supp. 2d 144, 150-53 (E.D.N.Y. 1998) (upholding hostile environment verdict based entirely on harassment of others). Here, the conduct was directed at someone who was not a Purdue Frederick employee, and who was not even present to hear the hostile remarks. Therefore, even considering the evidence of Amundsen's reaction to the female doctor, Hocevar did not start out with a strong case. The standards for establishing a hostile environment are set high so that

Title VII "does not become a 'general civility code.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quoting Oncale, 523 U.S. at 80).

But Hocevar's claim truly struck the shoals when she admitted she used the sort of language she now complains of.  In Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999), we held that a plaintiff could not show others' workplace conduct was subjectively offensive when she did the same thing herself.  "Appellant's evidence of a hostile work environment falls flat in light of the fact that she engaged in the very type of conduct about which she now complains . . . ." Id. at 967.  Accord Gleason, 118 F.3d at 1146.

For these reasons, I concur in affirming the summary judgment entered against Hocevar on her hostile environment claim.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.