**Mary Jo MURPHY, Plaintiff,**

v.

**M.C. LINT, INC. d/b/a Polk County Heating and Cooling Melvin Lint; and Mark Young, Defendants.**

No. 4:04CV90364.

United States District Court, S.D. Iowa, Central Division.

July 27, 2006.

Jaki K. Samuelson, Gretchen Witte Kraemer, Whitfield & Eddy, Plc, Des Moines, IA, for Plaintiff.

Russell L. Samson, Rebecca Boyd Dublinske, Dickinson Mackaman Tyler & Hagen Pc, Des Moines, IA, for Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

PRATT, Chief Judge.

On July 13, 2004, Plaintiff Mary Jo Murphy ("Murphy") filed a Complaint against Defendants, M.C. Lint, Inc. d/b/a Polk County Heating and Cooling (hereinafter "PCHC"), Melvin Lint ("Lint") and Mark Young ("Young"). In her Complaint, Plaintiff asserts five claims: Hostile Work Environment (Harassment and Discrimination Based on Gender) in violation of Title VII, 42 U.S.C. § 2000e et seq. and in violation of the Iowa Civil Rights Act ("ICRA"), Iowa Code Chapter 216; Violation of the Family Medical Leave Act ("FMLA"), pursuant to 29 U.S.C. § 2617; and Retaliation, in violation of both Title VII and the ICRA.

On May 15, 2006, Defendants filed a Motion for Summary Judgment (Clerk's No. 28), alleging that no genuine issue of material fact exists on any of Plaintiff's claims. Plaintiff filed a resistance (Clerk's No. 30) to Defendants' motion in regard to the Title VII, ICRA, and Retaliation claims, but concedes that she cannot prove her allegations under the FMLA. See Pl.'s Resistance Br. at 19 ("Plaintiff voluntarily withdraws her claim for relief under the [FMLA]."). Defendants filed a reply (Clerk's No. 31) to Plaintiff's resistance on June 20, 2006. Neither party requested a hearing, and the Court does not believe oral argument would substantially aid in resolution of the motion. Accordingly, the matter is fully submitted.

## I. FACTS

Plaintiff Murphy was hired at PCHC in 1995. PCHC is an Iowa corporation with its principal place of business in Polk City, Iowa, and is owned by Defendant Lint. PCHC is a company dedicated to providing electrical and plumbing services for various construction projects. During her tenure with PCHC, Murphy performed many tasks in the nature of "Clerical/Sales Support" and "Sales Support/Job Coordinator." Defs.' App. at 126 (Iowa Civil Rights Questionnaire). Such tasks, according to Plaintiff, included amongst other things: coordinating jobs, tracking operations during construction projects, creating project schedules, performing preparatory construction tasks, such as verifying permits and building codes, organizing training classes and licensing for workers, maintaining medical insurance benefits paperwork, and providing miscellaneous office support. Id. at 126–27.

Generally, PCHC has numerous male "field employees," i.e., plumbers and electricians, that work primarily outside the PCHC office. The office itself arranges and coordinates the field work and performs administrative tasks for the maintenance of the business, and during Murphy's tenure, was staffed by Lint, Mark Young, and several female clerical employees, including Murphy, Carla Peck, and Brenda Brauer.[1] Due to the predominantly male staff, Lint "always told the girls ... 'You've got to be aware that you're working for plumbers and electricians, and sometimes they may say some words that are inappropriate language.'" Lint Dep. at 68.

In 1998, Murphy attended an apprenticeship training course at the request of Lint. Murphy Dep. at 7; Defs.' App at 185 (Certificate of Attendance). The class, put on by "ABC,"[2] focused on equal employment opportunity and affirmative action, but also discussed sexual harassment and discrimination. Murphy Dep. at 7. Murphy discussed with Lint the training she received during the class. *Id.* At some later point, Lint became interested in establishing a written company policy, and directed Murphy to obtain information from ABC. *Id.* Murphy, on behalf of Lint, requested a packet of materials from ABC regarding how to form a personnel policy for the company. *Id.* The packet included information about sexual harassment and other forms of discrimination, and Murphy incorporated that information into an employee policy handbook which was ultimately distributed to employees. *Id.* at 11–12.

The policy handbook was entitled "What We Expect From You" and provides that clothing including "words or graphics that depict any type of illegal, sexual or offensive activity or image" is prohibited. Defs.' App. at 111. Courtesy, a respect for confidential information, and quality work are all required. *Id.* at 110–12. While the policy handbook explicitly does not seek to identify all types of prohibited behavior, it does provide that misconduct of any sort may be disciplined by any of the following, in any order: a verbal warning; written warning or reprimand; probation; suspension from work without pay; suspension subject to discharge; and discharge. *Id.* at 110. The handbook specifically provides that "the violation of any of the following items may subject you to automatic suspension, subject to discharge ... harassment of another employee of a sexual nature or otherwise, including but not limited to verbal or physical conduct, or unwelcome advances with regard to or on the basis of sex, race, color, national origin or ancestry, age, religion, creed, marital status, or status as a handicapped person." *Id.* at 118–19.

Murphy claims that during her employment with PCHC, she was subjected to various and repeated offensive conduct of a sexual nature, such that her working environment was particularly hostile for her as a woman. Specifically, Murphy has identified the following incidents in support of her claim for hostile work environment:

1) A PCHC employee named Travis Hogue wore a t-shirt "that said something about co-ed sexual plumbing." Murphy Dep. at 39. Murphy claims that "there were numerous times that [Hogue] wore similar shirts." *Id.* Murphy testi-

---

1. It appears from the record that several other employees worked for some period of time in the office during Murphy's employment at PCHC, however, none of those employees are discussed in detail in the record.

2. The record is unclear as to what type of entity "ABC" is, but reveals that the company offered apprenticeship training courses to PCHC.

fied that anytime she saw Hogue wearing something sexually inappropriate, she told Lint. Sometimes, Lint told Murphy "to tell him that he needed to put a work shirt over the T-shirt so that nobody could see the T-shirt." *Id.* On June 13, 2002, Lint sent a memo to Hogue (typed by Murphy) noting that Hogue had "worn a shirt to work that includes graphics that depict sexual or offensive activity" and reminding him of the company policy regarding appropriate clothing. Defs.' App at 123. Murphy cannot recall Hogue wearing another inappropriate shirt until his last day of employment, approximately three weeks later. Murphy Dep. at 40–41. On that day, July 3, 2002, Hogue wore a shirt that violated company policy. When Murphy reported it to Lint, Lint merely stated, "Yeah, I know." *Id.* at 39. While Murphy claims that she was happy with the outcome of the memo, she also expressed her belief that Lint should have brought up the clothing issue "to everybody for a reminder, because there were several employees that were doing it." *Id.* at 41. Murphy does admit, however, that on approximately three occasions after implementation of the policy handbook, Lint "brought up that type of thing" at weekly staff employee meetings. *Id.* at 41.

2) Murphy points to another male employee of PCHC who wore a "co-ed naked billiards" t-shirt. *Id.* at 43. She claims that upon reporting the violation to Lint, Lint had her tell the employee to turn the t-shirt inside out. *Id.* at 43.

3) Murphy claims that she talked to Lint about a male employee named Ken Anderson putting his arm around her, on an unspecified date. *Id.* at 44. Lint told Murphy that "he [Anderson] was benign." *Id.* at 45. Murphy, on her own initiative, wrote a note to Anderson stating: "I don't care how benign it may be. I am not comfortable being touched by a co-worker. It makes it very difficult for me to work with you & I want you to stop." [3] Defs.' App. at 121. Anderson wrote Murphy a written apology, stating: "Thank you for bringing that to my attention. I will certainly stop that immediately. I apologize & ask for your forgiveness." *Id.* at 122. Murphy claims she was satisfied with the resolution of the incident. Murphy Dep. at 45.

4) In approximately 1998, a PCHC employee named Gary Schad phoned Murphy at work. *Id.* at 52–53; Defs.' App. at 132 (Iowa Civil Rights Questionnaire). When Murphy asked what he wanted, Schad stated, "I want to fuck you." *Id.* Murphy claims she told Schad, "Oh, you don't want to say that to me. You don't do that at work. I can't talk-I can't talk like that." Murphy Dep. at 53. Murphy told Lint, Mark Young, and several other employees about the incident during an office meeting shortly after it occurred. *Id.* at 53–54. Murphy does not recall Lint responding, but does recall Mark Young saying, " 'Gary Schad'; with a big question mark behind it." *Id.* at 54. Murphy claims that she said during the meeting that some-

---

**3.** While Murphy does not specify a date of the incident, the note she wrote to Anderson is dated May 12, 1998. *See* Defs.' App. at 121.

thing needed to be done to stop such behavior, but that nothing was said or done in response. *Id.* at 55.

5) In October 2002, Murphy, Jeff Foster, and approximately thirty to thirty-five male staff members were eating donuts before a meeting. Defs.' App. at 133 (Iowa Civil Rights Questionnaire); Murphy Dep. at 56. When Foster was offered a "long john" donut,[4] he said, "Why don't you give it to Mary Jo [Murphy]! I heard she'll eat about anything." *Id.* Murphy got up and went to Lint's office and told him what happened. Murphy Dep. at 56. Murphy believes that Lint offered to say something, but that she declined and stated she would handle it on her own "because it had gotten to the point where I was being retaliated against when I came forth with complaints; the way that it was being handled was just backfiring on me, it wasn't making any progress towards lowering the amount of abuse that was going on, it was actually just fueling the fire." *Id.* at 58–59. When she emerged from Lint's office, Murphy told Foster that she had told Lint what happened and that "it was inappropriate and it better not happen again." *Id.* at 57. Foster apologized. *Id.* Murphy was not happy with the apology because the comment was made in front of so many people: "It has a tendency to have a trickle-down effect ... it's a man saying something to a woman sexually in front of thirty or thirty-five other men; it sort of opens the door for other people to say what they feel like they want to say." *Id.* at 57.

6) In approximately 2000 or 2001, Murphy informed Travis Hogue that he had recorded something improperly on a job folder. Hogue said, "Oh, blow me," which Murphy interpreted as Hogue referring to oral sex. *Id.* at 60. The comment was made in the break room with other people in attendance. Murphy immediately reported the matter to Lint. While Murphy admits that it is possible that Lint responded in some way, she expressed a relative certainty that Lint did not offer to do anything "because I recall just like spinning around and going out the door frustrated." *Id.* at 62.

7) In approximately 1998 or 1999, Murphy was talking to Doug Beckett on the wireless radio. Defs.' App. at 133. She asked him to pick up several size C batteries and Beckett stated: "What's up, you need some for your hummer?"[5] *Id.* Murphy reported the matter to Lint, who told her to write a memo regarding radio requirements. Murphy Dep. at 65–66. Murphy testified that Beckett later talked to her privately about the matter and stated that "as soon as he said it, he knew what he had done, and that he was sorry that he had said it." *Id.* at 65. Murphy was pleased that a memo was distributed, but was not ultimately happy with the outcome because many people could have heard the radio transmission and she

---

4. When asked what was sexual about Foster's statement, Murphy replied that because it was a "long-john" donut, the comment was "said in the context of being like a blow-job, that I would eat anything." Murphy Dep. at 57–58.

5. Murphy expressed that she and all others involved knew that the term "hummer" was synonymous with "vibrator." Murphy Dep. at 65–66.

"found it very offensive . . . and still do[es]." *Id.* at 66–67.

8) Throughout the time of her employment with PCHC, an employee named Gary Thornton stated to Murphy over the phone between 10–20 times, "You sure feel good today." *Id.* at 68–69. During Murphy's last year of employment with PCHC, Thornton made such a statement "a couple of times." *Id.* at 69. Murphy always told Thornton to "knock it off." *Id.* at 69. On more than twenty occasions, both in person and on the phone, Thornton would tell Murphy, "I can't tell you what I want but I'll tell you what I need." *Id.* at 70. In the last year of her employment, Thornton made such a statement "five, maybe even ten" times. *Id.* Thornton asked Murphy over the phone on approximately three occasions if she was wearing black panties. *Id.* at 71. Murphy does not recall any of these occasions being during the last year of her employment. *Id.* at 71. Murphy talked to Lint about Thornton's statements to her "at least twice," once during an office meeting in approximately 1998, and another time in 2000 or 2001 in Lint's office. *Id.* at 72. Murphy also testified that she talked to Mark Young about Thornton harassing her, though not about the "black panties" incidents specifically, shortly after Young became supervisor. *Id.* at 73.

9) Approximately thirty times from 2000 on, Gary Thornton called Murphy "Mary Ho as in Mary Whore, not Mary Jo." Defs.' App. at 133; Murphy Dep. at 74. While Murphy does not recall speaking to either Lint or Young about the matter, she testified that Young "knew about it, because he'd been there; he'd been present when it had been said before . . . numerous times." Murphy Dep. at 75.

10) Murphy claims that "hundreds of times [Gary Thornton] reached for my breast or crotch as we meet in a doorway where I have opened the door." Defs.' App. at 133. Thornton never actually made contact with Murphy's person, but stopped "within inches" of actual contact. Murphy Dep. at 78. Murphy complained to Lint about the matter. Also during her conversation with Lint on the matter, Murphy complained about "some very graphically offensive sexual remarks" that Thornton made to her. *Id.* at 79. One such remark consisted of Thornton asking Murphy if she "wanted to get licked." *Id.* at 83. Lint "said that he would take care of the problem and I shouldn't worry about retaliation because he had ways of taking care of things where it wouldn't come back on me." *Id.* at 79–80. In response to Murphy's complaints, Lint "put Mark Young in charge of making sure that Gary wasn't in the office unless he was there for business." *Id.* at 78.

11) After Young was placed in charge of keeping Thornton out of the office, Murphy observed Thornton coming up the stairs as she neared the stairwell: "It was a very hot day, and he had his shirt up on his head, wrapped around like a turban, and he had cut-off sweat pants that he was wearing. . . . And he came upstairs with his hands in his pants pulled down, exposing himself." *Id.* at 84. "Did I see his penis? Yes. Did he have his hands on it? Yes. Was he pulling on it? Yes." *Id.* at 85. Murphy "halted and then bolted" and reported the matter to

Mark Young a few months later. *Id.* at 85–86. Murphy testified that Young didn't believe her: "He didn't really say anything, other than just 'psss' with his hand; makes a gesture to blow me off, 'Psss, that never happened,' that type of gesture." *Id.* at 87. Murphy did not report the incident to Lint "[b]ecause I was to-Mark was supposed to be the one that was the gatekeeper, to keep Gary out. It was to a point where it didn't matter what I complained about, the same action was being taken and it was always—the resolve was either, 'Well, let's talk with that person, let's get the perpetrator in here and we'll talk with them, you and I one-on-one with that person.' That wasn't acceptable to me. It was very threatening to me; certainly not inviting." *Id.* at 90.

12) At some time following the stairwell incident with Thornton, Thornton telephoned the office and spoke with Murphy. "[H]e had been drinking, and his conversation with me on the phone had nothing to do with work, and I terminated the call." *Id.* at 88. Murphy went into Mark Young's office and Thornton called again. "Mark took the call, told me it was Gary Thornton and it was for me. I told Mark that I didn't want to talk to him ... because he was intoxicated and it would have nothing to do with work, and [Young] said I had to talk with him. So I took the call, and it had nothing to do with work." *Id.* Regarding the content of the call, Murphy testified it was "something nasty ... something sexual." *Id.* at 93–94. Murphy, upset over being forced to talk with Thornton again, told Young that the call had not been business related. *Id.* at 88.

13) When asked whether Murphy had other complaints about Thornton, she testified at deposition: "He said hundreds of things." *Id.* at 91.

14) Regarding Young being placed in charge of keeping field personnel out of the office, Murphy testified that "[h]e didn't make any attempt to keep them out of the office." *Id.* at 92. When asked if she could think of any examples where field personnel were "in the office and they shouldn't have been in there and then they said something offensive to you that you considered to be harassment and [Young] was there?," Murphy replied: "Numerous times." *Id.* Murphy believes that she had at least one discussion with Young about keeping people out of the office when their work there was done, but felt that Young's attempts to manage the situation were a "miserable failure." *Id.* at 92–93.

15) On April 23, 2003, Young directed Jeff Tscherter to have Murphy call Gary Schad regarding "a code update class." Iowa Civil Rights Questionnaire at 9. Murphy told Tscherter, "I don't call Gary Schad," and Tscherter replied, "Mark Young just told me you do." *Id.* Murphy made the call, wherein nothing improper occurred. Nonetheless, she claims, "It was open knowledge that I was under distress anytime that I was around [Schad] or anytime I had to talk to him; I felt like I was just put up against the wall." Murphy Dep. at 95.

16) Murphy claims that in 2002, Young harassed her about a personal telephone call she made from work when her mother was in the hospital. Iowa Civil Rights Question-

naire at 9. Young brought Murphy a phone bill showing two calls to Wisconsin, while other people were present in the area. Murphy told Young that one of the calls was hers and she would be happy to pay for it. Murphy Dep. at 97. Murphy claims that "[o]ther employees are not harassed about such matters." Iowa Civil Rights Questionnaire at 9.

17) Murphy testified that Young talked "in my hearing about visiting . . . a stripper he knows, for personal attention and lap dances." Iowa Civil Rights Questionnaire at 9. "It was a couple—two or three different occasions that he brought her up; once was upstairs when he was in his office talking to Brenda, who was in her area . . . which bled over into my cubicle, another time he was talking with a former employee, Scott Kurtz. . . . I was sitting like across the table from him and a couple . . . chairs down." Murphy Dep. at 103–04. One occurrence was on November 14, 2002, however, Murphy is unsure of when the other incident occurred. *Id.* at 105. During the conversation with Kurtz, Murphy recalls "[Young] and Kurtz had made some comment that maybe I should try dancing, and I said no, that wouldn't be for me, and one of them said, 'Well, that should be for us to decide.' " *Id.* at 106.

18) On January 1, 2003, Murphy claims she made a comment about absentee reports not being particularly effective, as they didn't reflect when employees left early. Iowa Civil Rights Questionnaire at 9. Young "threatened my job saying 'If you don't like them, you can leave.' He stated the other employees weren't the problem, but the Company needed someone there every day and 'it wouldn't be a problem if I wasn't gone all the fricken time.!' " *Id.* at 9–10.

19) On approximately January 20, 2003, Murphy requested time off to care for her sick daughter. *Id.* at 10. Young challenged the validity of the request by calling Murphy's ex-husband to verify that their daughter was actually sick. *Id.* Murphy reported the incident to Lint. Murphy Dep. at 109.

20) On January 21, 2003, Murphy claims "[Young] followed me while I picked up prescriptions at the pharmacy." Iowa Civil Rights Questionnaire at 10.

21) On January 24, 2003, "[Young] made a snide remark about me attending a previously scheduled appointment." *Id.* "By this time, he had been harassing me numerous times per day every day that I worked, and the environment was getting very unfriendly." Murphy Dep. at 114. Murphy testified that she believed Young's harassment of her in regards to following her and questioning her time off requests related to her absentee time from work. *Id.* at 115.

22) In April 2003, Young, Murphy, Rod Balentine, and Tom Sally were in the backroom of PCHC. Iowa Civil Rights Questionnaire at 10. "Tommy is saying 'Mother Fucker, Fucking asshole, dirty old bastard.' Mark Young says back 'What did ya do get your tit caught in a wringer?' 'You need to get married, you have ding dongs, get fat, stop having sex, watch T.V.' Rob says 'Take out a few loans so your stuck forever.' Mark Young says 'Tom, you're a gay woman trapped in a man's body.' " *Id.* Murphy "found the discussion

very offensive and had told Mark Young and Mel Lint on prior occasions that I found such conversation and language offensive." *Id.*

23) Murphy claims that Young accused her of taking money from petty cash in 2003, but that Brenda Brauer later admitted taking the missing money. *Id.*

24) Young and Brenda Brauer had a discussion in Murphy's hearing about a television show, "Fear Factor," where contestants ate "several feet of horse rectum." Murphy Dep. at 116. Young "kept going on saying, 'Have you ever noticed when a horse shits, how it puckers its butt,' and how the camera was zooming in and out on that while it was happening, while these people were consuming horse rectum and laughing about it." *Id.* Murphy asked Young and Brauer not to continue the conversation because it was making her sick. *Id.* at 116–17. Murphy claims her request "just fueled their fire and they continued to talk more about it, louder about it, more graphic about it." *Id.* at 118. Murphy reported the incident to Lint during a conversation "about cumulative things that had been going on ... harassing behaviors that were going on at the time." *Id.* at 117.

25) In January 2003, Young began publicly displaying dates that Murphy had time off on an office calendar posted in the front office, though no other employee absences were displayed in such a manner. Iowa Civil Rights Questionnaire at 10.

From 1997 until the middle of 2003, Young was a Purchasing Agent for PCHC. Defs.' Statement of Undisputed Facts ¶ 91. He became office manager in March 2002, and directly supervised Carla Peck, Brenda Brauer, and Murphy. *Id.* In early 2003, Defendants claim that Lint told Young that he wanted less day-to-day involvement with the management of PCHC. *Id.* ¶ 92. Defendants assert Lint and Young determined that PCHC would need to hire someone with an accounting background that could also do the purchasing and job costing for PCHC. *Id.* They also claim to have discussed that many responsibilities in the office were being done by more than one person, leading to inefficiencies. *Id.* While it is unclear from the record if it began before or after the Lint/Young meeting in early 2003, sometime during this time frame, several of Murphy's job duties were reassigned to other staff. For example, Brenda Brauer began doing "electrical as-builts," "one-call locates," and starting job folders, and Mark Young became the builder contact person, all duties formerly assigned to Murphy. In mid–2003, Young became Operations Manager for PCHC. *Id.* at ¶ 91. In May 2003, Murphy was given approximately six weeks notice that she was being terminated as a result of a company reorganization. *Id.* ¶ 95. Defendants claim that Murphy's position was eliminated because it was "apparent that on those days in which Mary Jo was absent, many of her job responsibilities were handled equally well or better by other staff members." *Id.* ¶ 93. Defendants also claim that Young and Murphy frequently conflicted over scheduling jobs, and that Young "did not believe that [Murphy] was qualified or capable of taking on any accounting, purchasing or job costing duties." *Id.* ¶ 94. Ultimately, Murphy's job duties were divided between Brenda Brauer, Carla Peck, Marc Lint, and Mark Young. *Id.* ¶ 95. PCHC also hired one additional female, Kari Middleton, to take on accounting and purchasing duties previously done by Young. *Id.* Murphy urges that the stated reasons for her termination are mere pretext for dis-

crimination and that the company was retaliating against her for complaining about harassment.

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 1 of the Federal Rules of Civil Procedure dictates that all Rules, including Rule 56, "be construed and administered to secure the just, speedy, and inexpensive determination of every action." Summary judgment, however, is not a paper trial. "The district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, and viewing that evidence in the light most favorable to the non-moving party, whether there is any material dispute of fact that requires a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); 10A *Charles A. Wright, Arthur R. Miller & Mary Kay Kane* § 2712, at 574–78. The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge*, 24 F.3d at 921.

■ As employment actions are inherently fact based, the Eighth Circuit has repeatedly cautioned that summary judgment in such cases should "seldom be granted . . . unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir. 1998) (citations omitted). *See also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minn. Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991) ("[S]ummary judgment should seldom be used in employment discrimination

cases."); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim . . . and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.-West Campus*, 160 F.3d 484, 486–87 (8th Cir.1998)).

However, this does not mean that summary judgment is never proper in employment cases. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 762 (8th Cir.1995)). Fed.R.Civ.P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir.1994); *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir.1990); *Woodsmith Publ'g v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the

nonmoving party must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c),(e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Finally, in considering a motion for summary judgment, the Court neither weighs the evidence, nor does it make credibility determinations. *See id.* at 252, 106 S.Ct. 2505. Rather, the court only determines whether there are any disputed facts and, if so, whether those factual disputes are both genuine and material. *Id.*

### III. LAW AND ANALYSIS

A. *Gender Harassment and Discrimination, Prima Facie Case (Counts I and II)*

■ Counts I and II of Murphy's Complaint allege sexual discrimination in violation of Title VII (Count I) and in violation of Iowa law (Count II). Federal case law supplies the basic framework for deciding cases under the ICRA. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1380 (8th Cir. 1996) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (1982)). Iowa courts "traditionally turn to federal law for guidance on evaluating the ICRA, but federal law ...

is not controlling." *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). Accordingly, the Court will address Plaintiff's state and federal law claims together.

■ Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Murphy does not allege direct evidence of gender discrimination in this matter. Thus, Murphy bears the burden of proving discrimination indirectly. *See Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991) ("direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude ... [c]omments which demonstrate a 'discriminatory animus in the decisional process' ... or those uttered by individuals closely involved in employment decisions may constitute direct evidence." (citations omitted)). Where a plaintiff relies on circumstantial, rather than direct, evidence of intentional discrimination, the Court applies the three-stage burden shifting approach developed by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Dammen v. UniMed Med. Ctr.,* 236 F.3d 978, 980 (8th Cir.2001).

■ Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the

plaintiff establishes a prima facie case, the burden of production shifts at the second stage to the defendant, who must articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." *Id.* at 255 n. 10, 101 S.Ct. 1089. The burden then shifts back at the third and final stage to the plaintiff, who is given the opportunity to show that the employer's proffered reason was merely a pretext for discrimination. *Id.* at 253, 101 S.Ct. 1089. The ultimate burden remains with the plaintiff at all times to persuade the trier of fact that the adverse employment action was motivated by intentional discrimination. *Id.*

■ To establish a prima facie case of gender discrimination or harassment on a typical disparate treatment theory, Murphy must demonstrate that: (1) she is within a protected class; (2) she was qualified to perform her job, or was meeting the legitimate expectations of her employer; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably. *See Schoffstall v. Henderson,* 223 F.3d 818, 825 (8th Cir. 2000); *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000); *Whitley v. Peer Review Sys., Inc.,* 221 F.3d 1053, 1055 (8th Cir. 2000).

■■ Murphy may also establish her claim by adequately establishing a case of hostile work environment. Sexual harassment of an employee that creates a hostile work environment constitutes discrimination within the meaning of Title VII. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Courts generally recognize two types of hostile work environment sexual harassment as actionable under Title VII:(1) sex-

ual harassment that is linked to the grant or denial of an economic *quid pro quo,* and (2) sexual harassment that creates an intimidating, hostile, or offensive working environment. *See id.* at 65, 106 S.Ct. 2399; *see also Morgan,* 536 U.S. at 110, 122 S.Ct. 2061.

■ In considering whether a working environment is hostile, courts examine all of the circumstances surrounding the hostile environment claim. *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1378 (8th Cir.1996). To make out a prima facie case of sexual harassment on a hostile work environment theory, Murphy must show that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper remedial action. *Wright v. Rolette County,* 417 F.3d 879, 884–85 (8th Cir.2005) (listing elements of sexual harassment claim in a section 1983 action and noting that elements are the same in an action under Title VII); *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993).

Defendants do not dispute that Plaintiff belongs to a protected class of persons, but argues that Murphy is unable to establish the remaining factors on either theory of discrimination.

### 1. *Sexual harassment discrimination.*

As noted, to establish a prima facie case of gender harassment or discrimination, Murphy must demonstrate: (1) she is within a protected class; (2) she was qualified to perform her job, or was meeting the legitimate expectations of her employer; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were

treated more favorably. *See Schoffstall v. Henderson,* 223 F.3d 818, 825 (8th Cir. 2000); *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000); *Whitley v. Peer Review Sys., Inc.,* 221 F.3d 1053, 1055 (8th Cir. 2000). While Defendants concede the first element, they make no argument regarding the remaining elements of gender harassment or discrimination, except as to a hostile work environment theory. Nonetheless, the Court will evaluate the remaining elements of Plaintiff's prima facie case on a disparate treatment theory.

### a. *Qualified to perform job.*

Defendants make no argument that Plaintiff was unqualified to perform her job. The closest argument made by Defendants is: "During 2002 and early 2003, it became apparent that on those days in which Mary Jo [Murphy] was absent, many of her job responsibilities were handled equally well or better by other staff members." Defs.' Br. at 12. Defendants also allege that, after the reorganization, PCHC hired an individual with an accounting degree and with prior experience in purchasing and accounting, to take over various of Mark Young's duties in those areas. *Id.* at 13. "Young ... did not believe that Mary Jo was qualified or capable of taking on any accounting, purchasing or job costing duties." *Id.*

Defendants' arguments certainly bear on the Court's analysis of whether Murphy was terminated for legitimate, non-discriminatory reasons, but have little bearing on the question of whether Murphy was qualified to perform her job duties at the time she was terminated. Indeed, Murphy had been performing the duties of her position for approximately eight years, and Defendants point to no deficiencies that would lead the Court to conclude that she was unqualified, as opposed to being perhaps less qualified than others. Moreover, a letter issued April 25, 2003, by Mel Lint, owner of PCHC, stated: "Due to

reorganization of the office staff, Mary Jo Murphy's position as job coordinator will be eliminated effective May 28, 2003.... Mary Jo's performance in no way caused, nor was a result of the restructuring within the company." Pl.'s App. at 240. Accordingly, the Court concludes that Plaintiff has amply established this element of her prima facie case.

### b. *Adverse employment action.*

■ In order to establish a prima facie case of gender discrimination, a plaintiff must demonstrate that she suffered an adverse employment action. *See generally Burlington Northern and Santa Fe Ry. Co. v. White,* — U.S. —, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *LaCroix v. Sears, Roebuck, and Co.,* 240 F.3d 688, 693 (8th Cir.2001). The Eighth Circuit has stated that "[n]ot everything that makes an employee unhappy is an actionable adverse employment action.... Rather, an adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits or responsibilities." *LaCroix,* 240 F.3d at 691. " 'Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action.' " *Sallis v. Univ. of Minn.,* 408 F.3d 470, 476 (8th Cir.2005) (quoting *Cruzan v. Special Sch. Dist. # 1,* 294 F.3d 981, 984 (8th Cir.2002)). Minor changes in working conditions that inconvenience an employee or alter the employee's work responsibilities do not rise to the level of an adverse employment action. *Sallis,* 408 F.3d at 476. Applying this high standard, the Eighth Circuit has concluded that "[c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." *Shaver v. Indep. Stave Co.,* 350 F.3d 716, 721 (8th Cir.2003) (construing the Americans with Disabilities Act and observing that "anti-discrimination laws do not create a general civility code").

Here, there can be no real doubt that Murphy suffered an adverse employment action. Her employment at PCHC was terminated. This is more than sufficient to satisfy the third prong of Murphy's prima facie case.

### c. *Similarly situated male employees treated more favorably.*

■■■■ To satisfy this element of her prima facie case of gender discrimination, Plaintiff must not only identify males who were treated more favorably, but Plaintiff also bears the burden of proving by a preponderance of the evidence that the male employees who were treated more favorably than she were " 'similarly situated in all relevant respects.' " *Jones v. Frank,* 973 F.2d 673, 676 (8th Cir.1992) (quoting *Lanear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir.1988)); *see also Lynn v. Deaconess Med. Ctr. W. Campus,* 160 F.3d 484, 487–88 (8th Cir.1998) (citing *Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 972 (8th Cir.1994)). As a general matter, the ultimate determination of whether "employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." *Palesch,* 233 F.3d at 568 (citing *Harvey,* 38 F.3d at 972). Indeed, the Eighth Circuit Court of Appeals has identified factors to be considered when evaluating whether employees are similarly situated to one another: "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark,* 218 F.3d at 918 (citing *Lynn v. Deaconess Med. Ctr.-W. Campus,* 160 F.3d at 487–88).

■■■■ Historically, the Eighth Circuit has routinely applied the rigorous "similarly-situated" standard to its review of summary judgment motions in employment discrimination cases. In 2005, however, the Court noted that another line of cases has applied a "low threshold" for employees to be considered similarly-situated at the prima facie stage of the *McDonnell Douglas* burden-shifting analysis. *See Rodgers v. U.S. Bank,* 417 F.3d 845, 852 (8th Cir.2005). This "low threshold" standard requires at the prima facie stage only that "employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.' " *Id.* at 851 (citing *Wheeler v. Aventis Pharms.,* 360 F.3d 853, 857 (8th Cir.2004)). Noting the conflicting lines of cases, the *Rodgers* Court chose "to follow the low-threshold standard for determining whether employees are similarly situated" at the prima facie stage of analysis. *Id.* at 852.

■■■■ Regarding the similarly situated factor, Plaintiff merely states that "similarly situated employees, who were not members of the protected group, were treated differently. Men who worked at PCH were not fired—despite drinking on the job and despite engaging in repeated harassing conduct. Ms. Murphy was discriminated against not only in relation to the treatment of men at PCH, but also in relation to the treatment of women who did not object to the vulgar sexualized atmosphere and conduct of the male co-workers and supervisors." Pl.'s Resistance Br. at 5–6. Plaintiff's position wholly fails to address the applicable legal standard to proceed on a disparate treatment theory of discrimination, even under the "low threshold" standard. She has not identified one single, non-female employee of PCHC who performed the same or even similar job duties for the same supervisor. Indeed, the record details only female employees in the office, other than Lint and Young themselves.[6] This is insufficient to

---

**6.** There are some references to males (i.e., Marc Lint) who appear to have occasionally worked in the office, but no indication that they were "similarly situated" to Murphy in all relevant respects.

sustain a prima facie case of disparate treatment.

## 2. *Hostile work environment.*

Defendants urge that Plaintiff has established only the first element of a claim of hostile work environment, that is that she is a member of a protected class. To reiterate, at this stage of the proceedings, Murphy must show that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper remedial action. *Wright v. Rolette County,* 417 F.3d 879, 884–85 (8th Cir.2005) (listing elements of sexual harassment claim in a section 1983 action and noting that elements are the same in an action under Title VII); *Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993).

### a. *Unwelcome sexual harassment.*

While Defendants claim that Plaintiff has not offered sufficient evidence to establish this element of her prima facie case, they offer no argument on the matter. Defendants do seem to make some implications regarding whether the conduct faced by Murphy was unwelcome, which the Court will now address. First, Defendants imply that foul language used by Murphy's male co-workers was not unwelcome because Plaintiff herself used profanity in the workplace. The Eighth Circuit Court of Appeals, in *Hocevar v. Purdue Frederick Co.,* 223 F.3d 721, 736 (8th Cir.2000) held: "A plaintiff cannot create a genuine issue of material fact with regard to unwelcome conduct when she engages in the conduct complained about." This Plaintiff's Complaint, however, is distinguishable from *Hocevar* both because complaints were made about the foul language, and because foul language is not

the only basis of Murphy's claim. *See Hocevar,* 223 F.3d at 729–30 ("There is a world of difference between the use of the infrequent swear word in the workplace, not actionable when not directed to a specific gender, and direct words demeaning to women in general. While [the plaintiff's] infrequent use of foul language may indeed, when presented to a jury, diminish her claim that the behavior of [her coworkers] was 'unwelcome,' it in no way bars her claim as a matter of law.") (Lay, J., dissenting).

 In the present case, Plaintiff's complaints about foul language form only a small portion of her overall dissatisfaction with the working environment at PCHC. Indeed, Plaintiff argues that she was subject to a plethora of abusive conduct, including having male staff say improper, sexually suggestive things to her on numerous occasions, being exposed to sexually explicit clothing articles, and having a male employee simulate groping her on "hundreds" of occasions. Considering the totality of the evidence, the Court believes that Plaintiff has, at a minimum, raised a genuine issue of material fact as to whether the treatment she experienced at PCHC was unwelcome.

### b. *Based on sex.*

 The next step in the inquiry is whether the unwelcome harassment was based on sex. *Quick,* 90 F.3d at 1377. Again, however, Defendants baldly state that Plaintiff has failed to proffer evidence sufficient to meet her prima facie burden on this element, but offer no argument on the issue. "Evidence that members of one sex were the primary targets of the harassment is sufficient to show that the conduct was gender based for purposes of summary judgment." *Id.* at 1378.

The Court can find no references in the record to male employees being subjected

to the type of inappropriate behavior Plaintiff complains of here. While there is no evidence that other females perceived their environment at PCHC to be hostile, it is sufficient that Plaintiff has offered evidence that she, a female, was the primary target of the alleged sexual harassment.

c. *Affected a term, condition, or privilege of employment.*

Plaintiff must show that the harassment affected a term, condition, or privilege of her employment. *Quick,* 90 F.3d at 1377. "This factor means that the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 1378 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted)). The Supreme Court has held that the conduct must be severe or pervasive enough to create an objectively hostile work environment and the victim must have subjectively perceived the environment to be hostile or abusive. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. Factors to consider include the frequency and severity of the conduct, whether it is physically threatening or humiliating (rather than a mere offensive utterance), and whether it unreasonably interferes with an employee's work performance. *Id.* at 23, 114 S.Ct. 367; *Quick,* 90 F.3d at 1378.

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, or coarse or boorish workers.... It is not a bright line, obviously, this line between a merely un-

pleasant working environment on the one hand and a hostile or deeply repugnant one on the other.

*Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430–31 (7th Cir.1995).

On the present facts, there can be no real question that Murphy perceived her working environment to be hostile, and Defendants do not dispute this. Rather, Defendants claim that Murphy has failed to show that her working environment was objectively hostile. Defendants argue that the discussions about strippers, eating horse rectum, and getting one's "tit caught in a wringer," were not discussions *about* Murphy, as Murphy admits she was merely present during those conversations and that they were not targeted at her. Defendants urge that, "at most [such conversations] were nothing more than somewhat suggestive office banter which occasionally contained sexual themes." Defs.' Br. at 5.

In evaluating a claim of hostile work environment, the Court must evaluate the totality of the circumstances. The Eighth Circuit Court of Appeals has routinely considered evidence of conduct that was not directly targeted at a plaintiff as supportive of a hostile work environment claim, when such conduct occurred during the time frame in which the plaintiff alleges she experienced harassment. *See e.g., Carter v. Chrysler Corp.,* 173 F.3d 693, 701 (8th Cir.1999) (finding relevant evidence that co-employees "persisted in reading Playboy within [plaintiff's] view", and finding relevant evidence of graffiti written about the plaintiff, even though plaintiff did not see it, where "she heard about its existence during the time in which she experienced harassment.") (citing *Schwapp v. Town of Avon,* 118 F.3d 106, 111–12 (2d Cir.1997) (allowing evidence of racially derogatory comments made outside plaintiff's presence)). Likewise, the Court of Appeals has considered evidence of conduct

that is not on its face discriminatory as supportive of a hostile work environment claim. "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." *Carter*, 173 F.3d at 701; *see also Bowen v. Mo. Dep't of Soc. Servs.*, 311 F.3d 878, 884 (8th Cir.2002) (finding that where two epithets made by plaintiff's harasser "carried clear racial overtones, they permit[ted] an inference that racial animus motivated not only [the] overtly discriminatory conduct but all of [the] offensive conduct toward [plaintiff]").

Defendants next attempt, albeit in a rather conclusory fashion, to diminish those incidents Murphy claims were harassing. With regard to alleged harassment by Young, such as making Murphy speak to Gary Schad on the phone after he had previously harassed her; asking about phone charges; talking about strippers in her presence; commenting that Murphy should try dancing; and phoning her ex-husband to verify her time-off requests, Defendant states simply that "[t]hese instances either taken alone or in conjunction with other incidents [did not][7] objectively affect[ ] a term, condition, or privilege of [Murphy's] employment." Defs.' Br. at 6. "Even the incident in which Thornton allegedly exposed a portion of his penis appears to have been an inadvertent exposure as Murphy happened to pass by the top of a stairwell and not something that was meant to intimidate or threaten her."[8] *Id.*

The objective requirement that Plaintiff be subjected to behavior that is "severe or pervasive" is a difficult standard to meet. *See Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir.2002) (overturning jury's verdict for plaintiff on this element). "To overcome summary judgment on her hostile work environment claim, Plaintiff must present evidence from which a reasonable jury could find that [the working conditions were] more than merely offensive, immature or unprofessional, for conduct that does not exceed that threshold of severity is insufficient to constitute a prima facie case of sexual harassment." *Henthorn v. Capitol Comm., Inc.*, 359 F.3d 1021, 1027 (8th Cir.2004). "The conduct 'must be extreme and not merely rude or unpleasant' before it can be said to have, in an objective sense, affected the terms and conditions of employment." *Id.* (quoting *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir.2003) (finding frequent calls to plaintiff's home, regular visits to her office, gifts, unnecessary touching of her arm, and frequent expressions of "I love you," to be inappropriate, but not actionable)). It has been noted, however, that "a hostile work environment actionable under Title VII is a function of both the severity and pervasiveness of the offensive conduct, with a high level of severity compensating for a low level of pervasiveness and vice versa." *Jackson v. Flint Ink N. Am. Corp.*, 370 F.3d 791, 794 (8th Cir.2004) (reversed en banc on other grounds); *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 759 (8th Cir.2003) (emphasizing that the harassment occurred continuously over a period of seven years); *Wright v. Rolette County*, 417 F.3d 879, 886 (8th Cir.2005) (observing

---

**7.** Defendants' Brief actually states that the conduct "objectively affected a term, condition or privilege of [Murphy's] employment." Defs.' Br. at 6. The Court presumes that Defendant meant to state that the incidents did *not* objectively affect a term, condition or privilege of Murphy's employment.

**8.** Defendants' assertion that the penis exposure incident "appears" to have been inadvertent implicitly recognizes the presence of a factual issue appropriate for jury consideration.

that harassing behavior took place over a two-year period).[9]

It is well settled that the determination of whether a work environment is objectively hostile or abusive is not a "mathematically precise test." *Harris*, 510 U.S. at 22, 114 S.Ct. 367. Nonetheless, there can be no doubt that even isolated incidents of hostile conduct in the workplace may have a greater impact when considered in light of their cumulative effect over a period of time. While none of the instances of harassment here alleged, standing alone, could be considered severe enough to maintain suit, Murphy has offered evidence of multiple moderately severe instances and countless less severe instances of offensive conduct. More importantly, Murphy has offered evidence that between 1998 and 2003, she was called derogatory names and subjected to lewd and lascivious actions, gestures, and conversations frequently, indeed on "hundreds" of occasions. This is far more than "somewhat suggestive office banter which occasionally contained sexual themes," as suggested by Defendants. *See* Defs.' Br. at 5.

■ While there is minimal evidence that Murphy's job performance suffered as a result of the inappropriate and unprofessional conduct she faced,[10] she has nonetheless presented sufficient evidence, at least at this phase of the proceedings, to satisfy the "high threshold of actionable harm," by demonstrating that her workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir.2003) (citation and internal quotations omitted). The alleged pervasiveness of discriminatory conduct compensates for any perceived lack of severity,

and is more than sufficient to create a genuine issue of material fact on this element of Murphy's claim, such that a reasonable jury *could* conclude that gender-motivated offensive behavior at PCHC was so pervasive or severe as to "poison" Plaintiffs' work environment. *See LeGrand v. Area Res. for Cmty. and Human Servs.*, 394 F.3d 1098, 1102 (8th Cir.2005).

d. *Employer knew or should have known and failed to take remedial steps.*

■ The last element of a prima facie claim of sexual harassment based on a hostile work environment is that the employer knew or should have known of the harassment and failed to take remedial steps. *Quick*, 90 F.3d at 1378. " 'Once an employer becomes aware of sexual harassment, it must promptly take remedial action which is reasonably calculated to end the harassment.' " *Tatum v. Ark. Dept. of Health*, 411 F.3d 955, 959 (8th Cir.2005) (quoting *Kopp*, 13 F.3d at 269). Here, Murphy has alleged that she was subject to discrimination and harassment by co-employees, and by her supervisor, Mark Young. In the case of harassment by a supervisor, the plaintiff need not show that the employer knew or should have known of the harassment; an employer is vicariously liable for supervisory harassment of an employee if the employee has suffered a tangible employment action. *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir.2005).

While Defendants point out that Murphy did not report each and every alleged incident of offensive conduct, they do not appear to claim that Murphy has failed to show that Defendants knew or reasonably

---

9. Much of the case law refers to the requirement as severe *and* pervasive.

10. Murphy did testify that she suffered from depression, lack of sleep, inability to concentrate, and general nervousness, all resulting in physical health problems, as a result of the harassment, but never tied such conditions to any difficulties in performing her job. Pl.'s App. at 183–86.

should have known about the harassment. Indeed, such an argument would be without merit. As the facts, *supra*, indicate, Plaintiff repeatedly went directly to the owner of PCHC to complain about conduct of her co-employees that she found inappropriate. On other occasions, Murphy complained to Young, or asserted that Young was present when the inappropriate conduct occurred. Clearly, during the times when Young was formally Murphy's supervisor, Murphy's complaints to him, or his personal observance of inappropriate conduct are sufficient to have put PCHC on notice that it may need to take remedial action to rectify the situation. Likewise, the Court finds, for purposes of summary judgment, that when Plaintiff complained to Young about field staff harassing her, this was also sufficient to put PCHC on notice, at least after the point that Young was "placed in charge" of keeping the field staff out of the office when they were finished with their work there. Lint specifically implemented this arrangement in an attempted response to one of Murphy's complaints, and it was appropriate for Murphy to report problems to Young since he was "in charge" of handling that situation.

Rather than claim lack of knowledge, Defendants argue that Plaintiff's claim must fail on this element because PCHC took appropriate measures to prevent and rectify the allegedly inappropriate behavior. Defendants aver that "Murphy ad-

mits that when she brought certain statements to [Lint's] attention, that he, on several occasions investigated, discussed the matter with the people involved, and that the person was told to discontinue the behavior and/or certain safeguards were put into place in order to prevent the recurrence of the alleged offending behavior." Defs.' Br. at 8. Defendants point out that when Murphy complained about an employee putting his arm around her, the employee issued a written apology. When another employee wore an inappropriate t-shirt, the employee was given a written notice about inappropriate attire. When Murphy complained about the "long-john" comment, Lint offered to talk to the employee about it. When Murphy complained about the "hummer" comment, Lint had a memo sent around regarding what could be said on the company radio. And when Murphy complained of inappropriate comments by Thornton, Lint placed Young in charge of making sure non-office staff were not unnecessarily in the office.[11] Defendants attempt to diminish Murphy's claim by pointing out that she failed to report the Thornton penis exposure until approximately two months after it occurred. Finally, Defendants argue that, since Lint put Murphy in charge of putting together a company handbook, any "failure in form" regarding whether additional policies or practices should have been in place at PCHC is "Murphy's failure."[12] Defs.' Br. at 10.

---

11. Defendants further point out that Murphy herself used swear words, had discussions regarding her prior marriage and about obtaining sperm from a neighbor during the relevant time period, and "had sexual relationships with two co-employees in 1995 and 1997." Defs.' Br. at 8. The Court, earlier in this opinion, discussed Murphy's occasional use of swear words. As to Murphy's discussion about sperm, Murphy admits it may have occurred, however, the Court finds that this one instance of inappropriate office conversation does nothing to diminish Murphy's claim,

as outlined herein. Moreover, Defendants fail to make any argument as to how Murphy's admitted romances with co-employees have any bearing on the present case. Indeed, there is no evidence in the record that Murphy's relationships were even known about at PCHC during the time frame in which Murphy claims to have suffered discrimination.

12. While Murphy was charged, at the direction of her employer, to put together some materials for a company policy handbook, there is absolutely no evidence that Murphy was also charged with updating the compa-

▆ Courts consider several factors when assessing the reasonableness of an employer's remedial measures, including the amount of time that has passed between the notice and the remedial action, the type of preventive and disciplinary measures taken, and whether the measures ended the harassment. *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 994 (8th Cir.2003). In this case, Murphy testified that, despite the verbal reprimands issued by Lint, and the one written warning issued to Travis Hogue, she continued to experience the same types of harassing behaviors from the same individuals. Moreover, while Young was placed in charge of keeping field staff out of the office as a remedial measure, Murphy testified that it was completely ineffective, and that both Young and field personnel continued to harass her. Lint himself testified that he only ever issued verbal warnings to the staff, despite a policy in place at PCHC that provided for increasingly harsh reprimands, up to and including termination.

▆ While Lint acted relatively quickly in issuing verbal reprimands, the record is devoid of evidence that either he or Young ever actually conducted an investigation into Murphy's complaints. The record does, however, indicate the presence of a genuine issue of material fact as to whether the remedial measures taken at PCHC in regard to Murphy's complaints were either adequate or effective at redressing the alleged harassment. Accordingly, the matter is best left to a jury to decide.

### B. Retaliation, Prima Facie Case (Counts IV and V)

▆ "A prima facie case of retaliatory discharge is established when the plaintiff shows: (1) engagement in protected activity; (2) defendant's awareness of plaintiff's engagement in protected activity; (3) plaintiff's subsequent discharge; and (4) that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive." *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir.1989). Murphy has undisputedly satisfied the first three elements of her prima facie case. She engaged in protected activity, that is, she reported harassing and discriminatory behaviors in the workplace. Plaintiff's complaints to Lint and Young about the problems amply demonstrate Defendants' awareness of Plaintiff's engagement in such protected activity. Additionally, Plaintiff was subsequently discharged from her employment at PCHC, demonstrating a concrete adverse employment action, discussed in further detail *supra* under the disparate treatment analysis. Thus, the only contradicted element of Plaintiff's prima facie retaliation case is whether Murphy has sufficiently raised an inference that her discharge was in retaliation for engaging in protected activities.

▆ In order to prove causation, a plaintiff must show that there was an intent to retaliate. *See Kunferman v. Ford Motor Co.*, 112 F.3d 962, 965 (8th Cir. 1997). Intent, of course, can be proven through a combination of knowledge and timing. *See id.* Where timing is suggested as proof of causation, however, the time between an employee's complaint and the employer's action must be "very close."

---

ny's policies. Indeed, on the evidence in the record, a reasonable jury could conclude that PCHC paid little, if any, attention to the policies in the handbook anyway. Defendants' assertion that any failure of the policies at

PCHC is Murphy's fault is tantamount to accusing Murphy of bringing on her own harassment—an allegation as absurd as it is improper.

*See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (finding 20 months too long to establish causation); *Heimbach v. Riedman Corp.,* 175 F.Supp.2d 1167, 1173–74 (D.Minn.2001) (termination a few days after notification demonstrates causation).

"An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Peterson v. Scott County,* 406 F.3d 515, 524 (8th Cir.2005) (internal citations omitted). Here, Defendants argue that Murphy first reported offensive behavior to Lint in 1998, and then again in 2000, 2001, and 2002, yet her employment was not terminated until May 2003. Defs.' Br. at 11. While there is no hard and fast demarcation between what temporal proximity is close enough or too far away to raise an inference of retaliation, the Court of Appeals has found that a period of two weeks between a claim of discrimination and termination is sufficient for a prima facie case, *see Peterson,* 406 F.3d at 524, but that a two month interval "so dilutes any inference of causation" that "as a matter of law [ ] the temporal connection could not justify a finding" of a causal link. *See Kipp v. Mo. Highway and Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir.2002); *Minn. Assoc. of Nurse Anesthetists v. Unity Hosp.,* 59 F.3d 80, 83 (8th Cir.1995) ("Long intervals between the conduct that is said to motivate an employer and the adverse employment decision complained of tend to undermine the inference that the discharge was retaliatory.").

██ While Plaintiff acknowledges that there is a temporal lapse between her last complaint of harassment and her termination, she does claim that "two weeks before I was given notice that my employment was terminated, Mel Lint told

me that I was bringing the harassment on myself." Pl.'s App. at 169 (Murphy Aff.). Though Lint denies making such a statement, the truth or falsity of Murphy's allegation is for a jury to decide. Additionally, the Court finds it relevant that Murphy's job duties were being reassigned to other employees far prior to her termination and in much closer proximity to the bulk of her complaints about harassment. Even were this not to constitute an "adverse employment action" within the typical meaning of that phrase, the Supreme Court held in *Burlington Northern and Santa Fe Ry. Co. v. White,* that the anti-retaliation provision of Title VII is not limited to conduct that affects the employee's compensation, terms, conditions or privileges of employment, as are the substantive provisions of Title VII. *Burlington,* 126 S.Ct. at 2411–12. Thus, Title VII provides "broader protection for victims of retaliation than for those whom Title VII primarily seeks to protect, namely, victims of race-based, ethnic-based, religion-based, or gender-based discrimination" victims than for "victims of discrimination." *Id.* 2414 (pointing out that this outcome is not anomalous, as Congress has provided similar kinds of protection from retaliation in comparable statutes). While it is a close case, the Court, taking the evidence in the light most favorable to Plaintiff, as it must at this juncture, finds that a genuine issue of material fact exists as to whether Plaintiff suffered adverse employment actions based on a retaliatory motive.

### C. Legitimate Non–Discriminatory Reason for Plaintiff's Discharge and Pretext

Defendant proffers that a company staffing reorganization was the legitimate, nondiscriminatory reason for Plaintiff's discharge, as opposed to either gender dis-

crimination or retaliation for complaining about gender discrimination. Specifically, Defendants claim that in early 2003, Lint told Young he wanted less day-to-day involvement in the management of PCHC and wanted Young to become Operations Manager. Lint and Young purportedly discussed office staffing issues and determined that PCHC would need to hire someone with an accounting background who could do purchasing and job costing duties when Young became Operations Manager. Young and Lint also determined that there were many inefficiencies in the current way that job duties were disseminated among the office staff. During 2002 and 2003, Defendants claim it became apparent that, on days when Murphy was absent, other staff were equally or more efficient at handling her job duties. Young also had concerns about the manner in which Murphy scheduled workers for jobs and did not believe that she was qualified or capable of taking on any accounting, purchasing or job-costing duties. Thus, the office staff was reorganized in May 2003. Murphy was terminated, her tasks were divided among preexisting staff, and a new female employee with a background in accounting and purchasing was hired.

■ The Court finds, and Murphy does not genuinely dispute, that Defendants have stated a legitimate non-discriminatory reason for Murphy's discharge. The Court, then, turns to the third stage of the *McDonnell Douglas* analysis, that is, has Plaintiff shown by a preponderance of the evidence that the reason given by PCHC for her termination was mere pretext. *See Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 897 (8th Cir.2004) (noting that to meet her burden at the third stage of the *McDonnell Douglas* analysis, a plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimina-

tion."). As the analysis under *McDonnell Douglas* is the same for both the hostile work environment claim and the retaliation claim, the Court will analyze the two together.

To support her conclusion that Defendants' stated reasons for termination were mere pretext for discrimination, Plaintiff argues: 1) if PCHC needed a worker with greater accounting capabilities, a more obvious solution would have been to fire Carla Peck, who handled payroll and accounting duties, and to hire an individual who could fulfill the accounting role; and 2) Young stated that he had concerns about Murphy's job performance, but a letter written by Lint, and Lint's deposition testimony, states that Murphy's performance was *not* the reason for her termination.

To overcome Defendants' proffered legitimate reason, Plaintiff must do more than assert that a jury might disbelieve it. Rather, Plaintiff " 'must present affirmative evidence' " that discrimination is the reason for the adverse employment action. *See Walton*, 167 F.3d at 428 (quoting *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505). The burden is not particularly onerous, however, as Plaintiff need not dispel all proffered lawful motives for her termination. Rather, she must show merely that a reasonable jury, considering all the evidence could, by a preponderance of the evidence, conclude that retaliation or discrimination "constituted a motivating factor in [her] discharge." *See Jackson v. Mo. Pac. R. Co.*, 803 F.2d 401, 407 (8th Cir.1986). Plaintiff's strongest argument in this regard is her allegation that Defendants have offered shifting explanations for her termination, such that an inference of pretext may arise.

■ Plaintiff points out that Lint specifically testified and wrote a letter stating that Plaintiff's "performance *in no way* caused" her termination. Pl.'s App. at 240

(emphasis added). Young produced an affidavit, however, indicating that he had "ongoing concerns and problems" with Murphy's handling of certain job tasks and that other staff handled Murphy's duties as well or better than she did. Defs.' App. at 166. According to the record, Young began shifting Murphy's job duties to the other office staff nearly as soon as he became office supervisor in March 2002. It was then in early 2003 that Young and Lint purportedly decided to restructure the company, and Murphy's discharge took place promptly after Young was appointed Operations Manager in mid 2003. Defendants urge that Lint's position and Young's statements about his "concerns" with Murphy's performance are not contradictory, as Murphy was not terminated for poor performance, but rather for being less productive than other staff members. The Court finds the matter to be a factual question best left to the jury to decide. Here, the alleged "concerns" over Murphy's performance, coupled with Lint's letter stating that her performance in "no way" led to her termination leads the Court to the following rule: "When an employer has offered different explanations for an adverse employment action and when evidence has been presented that would allow a reasonable trier of fact to disbelieve each explanation, the trier of fact may reasonably infer that the employer is hiding something—that is, that the true explanation is unlawful discrimination." *Young v. Warner–Jenkinson Co., Inc.*, 152 F.3d 1018, 1024 (8th Cir.1998).

On the record before it, the Court believes a reasonable jury could infer, from the timing of circumstances and events, that an unlawful motive gave rise to Murphy's termination. Murphy complained about harassment and discrimination repeatedly from 1998 until her termination. Some of these complaints were made to Lint about Young and other employees, and other complaints were made *to* Young

while he was in a supervisory capacity. After officially being made the office supervisor, Young, an accused harasser, began shifting Plaintiff's job tasks to other employees, and then terminated her promptly after taking over the day-to-day operations of the company. The Court finds that reasonable minds could differ on the implications of these factors, and the matter is, therefore, best left to a jury's determination. This is particularly true when one considers the eloquent words of the Second Circuit Court of Appeals when ruling on a similarly "close" case in *Gallagher v. Delaney*:

> Today, while gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting, a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation.

> The factual issues in this case cannot be effectively settled by a decision of an Article III judge on summary judgment. Whatever the early life of a federal judge, she or he usually lives in a narrow segment of the enormously broad American socio-economic spectrum, generally lacking the current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications. *See, e.g., United States ex rel. Toth v. Quarles*, 350 U.S. 11, 18, 76 S.Ct. 1, 100 L.Ed. 8 (1955) ("Juries fairly chosen from different walks of life bring into the jury box a variety of different experiences, feelings, intuitions, and habits."); *United States v. Shonubi*, 895 F.Supp. 460, 482–88 (E.D.N.Y.1995) (methods triers of fact employ in deciding cases).

*Gallagher,* 139 F.3d 338, 342–43 (2d Cir. 1998) (some citations omitted) (*abrogated on unrelated grounds* ).

## V. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is granted as to Plaintiff's claims stemming from disparate treatment gender discrimination. It is DENIED as to Plaintiff's hostile work environment claims under Counts I and II, and DENIED as to Plaintiff's retaliation claims under Counts IV and V.

IT IS SO ORDERED.